## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARCEY BERGES,

              **Plaintiff,**                              **Civil Action**

v.                                             **No. 09-2129-DJW**

STANDARD INSURANCE COMPANY,

              **Defendant.**

## MEMORANDUM AND ORDER

Pending before the Court are the following motions: (1) Defendant Standard Insurance Company's Motion for Judgment on the Administrative Record (doc. 15); and (2) Plaintiff Marcey Berges' Motion for Summary Judgment (doc. 28). For the reasons set forth below, the Court will construe Defendant's motion as one for summary judgment, and will grant it. The Court will deny Plaintiff's motion for summary judgment.

## I.    Nature of the Matter Before the Court and Background Information

This is an action brought pursuant to section 502(a)(1)(B) of the Employment Retirement Income Security Act ("ERISA")[1] to recover benefits Plaintiff claims are due her under the terms of a long-term disability plan. Plaintiff was a participant in her employer's long-term disability plan, which was insured and administered by Defendant. Plaintiff filed a claim for long-term disability benefits that Defendant denied. She now seeks judicial review of Defendant's decision denying her benefits.

---

[1]29 U.S.C. § 1132(a)(1)(B).

Before proceeding further, the Court notes that Defendant's motion seeks "judgment on the administrative record." As the Tenth Circuit recognized in an ERISA case similar to this one, "[t]he Federal Rules of Civil Procedure contemplate no such mechanism as 'judgment on the administrative record.'"[2] The Tenth Circuit thus held that "[p]arties should avoid the practice of requesting it, and courts should avoid purporting to grant it."[3] It did not provide specific guidance, however, as to how the lower court should treat such a motion.

Here, Defendant states that it "files this Memorandum in Support of its Motion pursuant Local Rule . . . 56.1,"[4] which addresses motions for summary judgment. The Court will therefore treat Defendant's motion as one for summary judgment. The Court notes, however, that the distinction between a motion for judgment on the administrative record and a motion for summary judgment is really more a matter of form than substance, because the Court's review of the facts in an ERISA case such as this is limited to the facts that are in the administrative record

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[5] In applying this standard, the court views the evidence and all reasonable inferences drawn from the evidence

---

[2]*Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1307 n.1 (10th Cir. 2007).

[3]*Id.* The Tenth Circuit in *Jewell* noted that characterizing an ERISA motion for judgment on the administrative record "often creates unnecessary work for an appellate court in deciding whether to construe such a motion ex post as one for a bench trial 'on the papers,' or as one for summary judgment." *Id.* (citations omitted).

[4]Def.'s Mem. in Supp. of Mot. for J. on the Admin. Rec. (doc. 16) at 5.

[5]Fed. R. Civ. P. 56(c) (2).

in the light most favorable to the nonmoving party.[6]  This legal standard does not change where, as here, the court is ruling on cross-motions for summary judgment,[7] for each party has the burden to establish its entitlement to judgment as a matter of law.[8]

The Court notes that in ERISA cases seeking review of a denial of ERISA benefits, the court's review is "limited to the administrative record," i.e., the materials compiled by the ERISA plan's administrator in the course of making its decision.[9] Thus, any evidence presented to the Court on summary judgment motions in this type of ERISA case is limited to the administrative record. At the same time, however, the Court notes that its review of the facts is not necessarily limited to the facts that the parties set forth in their briefs as the "uncontroverted facts."  As is discussed in more detail below in Part V, the Court must review the administrative record in this case to determine whether Defendant's decision to deny Plaintiff benefits was arbitrary and capricious.  And in doing so, the Court should consider whether "substantial evidence" supported the decision.[10] Whether evidence is "substantial" must be "evaluated against the backdrop of the administrative record as a whole."[11]  Thus, in ruling on the parties' summary judgment motions in this case, the

---

[6]*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[7]*Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[8]*Id.*

[9]*Holcomb v. UNUM Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (citation omitted).

[10]*Hancock* v. *Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009).

[11]*Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006) (citation omitted).

Court must evaluate the entire administrative record and not just those particular facts the parties have plucked from the administrative record and inserted into their summary judgment briefs.

In ruling on the parties' motions, the Court must keep in mind that cross-motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another."[12] To the extent the cross-motions overlap, however, the court may address the legal arguments together.[13] The Court notes that in this case, the legal issues and arguments made with respect to both motions are virtually identical. Thus, the Court will address the legal issues together.

## III.   Summary of the Parties' Arguments

As is discussed below in greater detail, to recover on her ERISA claim, Plaintiff must establish that Defendant's decision to deny her long-term disability benefits was arbitrary and capricious. One way to do that is to show that the decision was not supported by substantial evidence. Plaintiff contends that Defendant's decision to deny her benefits was arbitrary and capricious and unsupported by substantial evidence. Plaintiff asserts the following seven reasons as grounds for the Court to enter summary judgment in her favor and award her benefits under the long-term disability plan.

---

[12]*City of Shawnee, Kan. v. Argonaut Ins. Co.*, 546 F.Supp. 2d 1163, 1172 (D. Kan. 2008) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

[13]*See Hjersted Family Ltd. P'ship v. Hallauer*, No. 06-2229-CM, 2009 WL 902428, at *2 (D. Kan. Mar. 31, 2009) (noting that court would address the arguments together, to the extent the motions and legal arguments overlapped).

First, the plan provides that the definition of disability applicable to a participant "will be the definition approved for your Employer by [Defendant]"; however, Plaintiff contends Defendant "has asserted nothing regarding the 'definition approved for your employer.'"[14]

Second, Plaintiff's job with her employer KCM Capital, Inc. required her to travel extensively and internationally, and Defendant failed to take this travel into consideration in concluding that Plaintiff was not disabled.

Third, the Dictionary of Occupational Titles ("DOT") 186.117-054, which Defendant relied upon, defines the occupation of "President, Financial Institution," and not "Chief Financial Officer." Plaintiff therefore contends that it was improper for Defendant to refer to and rely upon DOT 186.117-054 in determining that Plaintiff was not disabled. It was also improper for Defendant to ignore Plaintiff's other job title of Chief Compliance Officer.

Fourth, Defendant never provided its two consulting physicians, Dr. Douglas Haselwood and Dr. Shirley Ingram, with Plaintiff's job titles, job descriptions, or statements made by Plaintiff regarding the requirements of her job.

Fifth, Drs. Haselwood and Ingram are not vocational experts.

Sixth, the administrative record does not make it clear what medical records Drs. Haselwood and Ingram reviewed.

Seventh, Defendant denied Plaintiff benefits without substantial evidence to support the decision.

Defendant, on the other hand, contends that its decision was not arbitrary and capricious, and that it was supported by substantial evidence. Defendant contends that it carefully and fully

_____

[14]Pl.'s Resp. to Def.'s Mot. for J. on the Admin. Rec. (doc. 22) at 18. *See also* Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 11.

reviewed the medical and psychological evidence in the record. Defendant consulted two board-certified rheumatologists who reviewed the medical records and concluded that Plaintiff was not disabled from systemic lupus erythematosus ("SLE"), Raynaud's syndrome, or arthritis, the diseases she claimed resulted in her disability. Furthermore, Defendant reviewed and considered the reports of Plaintiff's treating rheumatologist, Dr. Kathryn Welch, who relayed Plaintiff's self-report that Plaintiff could not work but who never stated in her own treatment records that Plaintiff was disabled or could not work. Defendant therefore asks the Court to uphold its decision denying benefits as supported by substantial evidence.

## IV. Facts

### A. General Information

Plaintiff Marcey Berges was an employee of KCM Capital, Inc. ("KCM") and served as its Chief Financial Officer. Plaintiff also contends that she was employed as KCM's Chief Compliance Officer. In May 2006, Plaintiff was a participant in a long-term disability plan sponsored by KCM (the "LTD Plan"). The LTD Plan was an "employee welfare benefit plan' within the meaning of §3(1) of ERISA. The LTD Plan provided disability benefits to eligible qualifying participants who complied with its terms and conditions.

Plaintiff stopped working for KCM on January 30 or 31, 2006. Plaintiff filed a claim for long-term disability benefits on June 7, 2006, using Defendant's form, entitled "Employee's Statement." On the Employee's Statement, Plaintiff listed SLE, Raynaud's, and arthritis as the

illnesses contributing to her "being unable to work at [her] occupation."[15]  She described her symptoms as "fatigue, pain, seizures, difficult breathing, [and] weakness."[16]

## B. Plaintiff's Job with KCM

On the Employee's Statement, Plaintiff identified her job title as "CF-Admin-CCO."[17]  On the "Employer's Statement," however, Plaintiff's employer, KCM, listed her job title as "CFO."[18]  On July 24, 2006, KCM submitted a job description for Plaintiff's job that was entitled "Chief Financial Officer/Chief Compliance Officer."[19]  That job description summarized the job as follows: "Head a staff of four employees.  Work closely with Portfolio Managers, Controller, Brokers and Prime Broker to manage trading, performance, research, and marketing elements of three hedge funds."[20] Either Plaintiff or her employer submitted a page from KCM's online personnel directory that identified Plaintiff as "CFO."[21]

In Plaintiff's "Attending Physician's Statement," which was a form completed by both Plaintiff and her treating physician, Plaintiff listed her occupation as "CFO."[22]  This statement was submitted to Defendant in April 2006.

---

[15]Admin. Rec. at 300-302 (doc. 17) (filed conventionally).

[16]*Id*. at 300.

[17]*Id.*

[18]*Id*. at 289.

[19]*Id.* at 1712.

[20]*Id.*

[21]*Id.* at 1706.

[22]*Id*. at 462.

On July 28, 2006, Plaintiff provided a memo to Defendant outlining her job responsibilities which stated that her position "was at an executive level as the Chief Financial Officer, Chief Compliance Officer and as the acting Chief Operations Officer."[23] In that memo, Plaintiff listed fifteen duties, all but one of which were also listed in the job description provided by her employer a few days earlier.[24] Both Plaintiff's memo and the job description submitted by her employer listed international travel as an element of her job, as follows: "traveled to Hong Kong and Shanghai to oversee the activities of co-fund managers."[25] Plaintiff's memo also stated that she had "marketed for the business, negotiated contracts and traveled all over the US, Hong Kong, China and Europe."[26]

On September 7, 2007, after Defendant had denied her claim for disability benefits on two occasions, Plaintiff's counsel submitted to Defendant a job description,[27] which differed somewhat from the two earlier-submitted descriptions. That job description summarized Plaintiff's duties as follows:

> The overall function of the Chief Financial Officer is to coordinate and oversee all aspects of financial and administrative functions of the Company, as well as to play a major role in the marketing and investment functions. The function of the Chief Compliance Officer is to coordinate the development, implementation, and operation of the compliance policies and procedures.[28]

---

[23]*Id*. at 1710-11.

[24]*Id*. at 1711, 1712. Plaintiff's memo included the extra duty of "budget analysis and projection for Management Company." *Id*. at 1711.

[25]*Id*. at 1711, 1712.

[26]*Id*. at 1711.

[27]*Id*. at 110-111.

[28]*Id*. at 111.

According to this job description, Plaintiff represented the company "at industry events around the world."[29]

In Plaintiff's counsel's September 7, 2007 cover letter enclosing the job description, he informed Defendant that Plaintiff " was required to travel internationally, market the business, speak publicly, have changing stock and investment information memorized for trading purposes and generally work at a high pace from sun up to sun down."[30]

### C. Relevant Provisions of the LTD Plan

To receive LTD Benefits under the LTD Plan, the participant must be disabled as defined by the terms of the LTD Plan. The LTD Plan defines disability as follows:

DEFINITION OF DISABILITY

The definition of Disability applicable to you will be the definition approved for your Employer by Standard. See your Certificate Label.

1.     THE OWN-OCC TO AGE 65 DEFINITION

* * * *

2.     THE 80/80 DEFINITION

Until LTD Benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily Injury, or Pregnancy, you are either:

a.     Unable to perform with reasonable continuity the material duties of your own occupation; or

b.     Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own occupation.

After LTD benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily Injury, or Pregnancy, you are either:

---

[29]*Id.*

[30]*Id*. at 110.

a.      Unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training, and experience; or

b.      Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own or any other occupation.[31]

3.      THE 80/50 DEFINITION

\* \* \* \*

Indexed Predisability Earning means an amount determined as follows:

Until you have been Disabled for one year your Indexed Predisability Earnings will equal your Predisability Earnings on your last full day of Active Work before you became Disabled . . . .[32]

Plaintiff's "Certificate Label" contained certain information regarding the LTD Plan specific to Plaintiff.[33] Among other things, it set forth Plaintiff's name, Member ID, Employer ID, and her employer's name and address. It also stated: "60% PREDISABILITY EARNINGS: $2500 MONTHLY MAXIMUM; 90 DAY ELIMINATION PERIOD; 80/80 DEFINITION; MEMBER DEFINITION 1."[34]

To receive benefits under the LTD Plan, a participant must provide adequate written proof of "loss" within the meaning of the Plan. The LTD Plan provides as follows:

Satisfactory written proof of loss in connection with a claim for benefits must be provided to Standard at the expense of the person filing a claim.

No benefits will be paid until Standard has received satisfactory written proof of loss in connection with the claim for benefits. Standard must receive satisfactory written proof of the following before LTD benefits will be paid:

---

[31]*Id*. at 32-33.

[32]*Id.* at 32-33.

[33]*Id*. at 23.

[34]*Id.*

1. That you became Disabled while insured under the Group Policy;

2. That you were disabled throughout the respective Elimination period and the period for which LTD benefits are claimed;

3. That your disability results from a cause not excluded in the Group Policy;

4. That you are under the regular care of a Physician; and

5. Such additional information as Standard may reasonably require in connection with your claim.[35]

Defendant insures the benefits provided by the LTD Plan. The LTD Plan grants the following authority to Defendant:

Except for those functions which the Group Policy specifically reserves to the Policyowner or Employer, we have full and exclusive authority to control and manage the Group Policy, to administer all claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.

Our authority includes, but is not limited to:

1. The right to resolve all matters when a review has been requested;

2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3. The right to determine:

   a. Eligibility for insurance;
   b. Entitlement to benefits;
   c. The amount of benefits payable; and
   d. The sufficiency and the amount of information we may reasonably require to determine a. b. or c. above.

Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.[36]

---

[35]*Id.* at 50-51.

[36]*Id.* at 56

**D.      Defendant's Initial Determination and Review of Plaintiff's Disability Claim**

*1.      Defendant's initial determination*

In support of her disability claim, Plaintiff presented medical records from her rheumatologist, Dr. Kathryn Welch, who treated Plaintiff for her claimed SLE, Raynaud's syndrome and arthritis.  Records were provided for the period November 2, 2004 through July 2006.  Dr. Welch's report of Plaintiff's November 29, 2005 visit indicated that Plaintiff reported having tachycardia and "increasing joint pain with the weather changes though overall her joints are doing fairly well."[37]  It also indicated that Plaintiff reported having trouble sleeping because of the tachycardia and that "[t]he Raynaud's is worse with weather changes."[38]  The report states that Plaintiff informed Dr. Welch that "[s]he is planning for a three month leave of absence to start late in January to see if she can get herself doing better so that she can do better at work."[39]  The report further states:

> We talked at length about her plans for her three months off.  I told her she really needs to rest and let her body catch up and then she needs to get going on a good exercise program and a good schedule.  I told her this was a great opportunity for her to get control of her health and hopefully then she will feel better enough that she can go back to work.[40]

Dr. Welch saw Plaintiff again on January 26, 2006.  Dr. Welch's report for that visit indicates:

> She reports that she has not had a big flare since her last visit, but she does not feel very well.  Her fatigue is still a huge problem . . . .  She is having less palpitations of her heart.  Joints and muscles are better.  She still has the Raynaud's but there are

---

[37]*Id.* at 503.

[38]*Id.*

[39]*Id.*

[40]*Id.* at 504.

no ulcers.  She has some joint complaints, but overall her joints are doing fairly well. She is planning to start a three month leave of absence next week and hopefully be able to get her disease under better control and her fatigue also better.[41]

The report notes that Plaintiff was able to successfully decrease her prednisone dosage.  The report also indicates that Dr. Welch and Plaintiff "discussed the need for an increase in her activity and exercise as tolerated."[42]

Dr. Welch's records regarding Plaintiff's March 23, 2006 visit indicate that Plaintiff was still fatigued and had morning stiffness and significant joint pain, but with little joint swelling.[43]  Plaintiff was walking daily and had lost 10 pounds.  Plaintiff reported that she was busy with her daughter and helping with Girl Scouts and her activities.[44]  Dr. Welch's records regarding a May 25, 2006 visit reflect that Plaintiff reported feeling tired and had pain in her calves and lower legs.  Plaintiff reported that she was regularly walking, practicing yoga and stretching and had lost 27 pounds, and reported that these activities made her feel better.[45]

None of the above-cited records show that Dr. Welch directed or recommended that Plaintiff stop working.

At Defendant's request, Dr. Welch completed an "Attending Physician Statement" in April 2006 to help Defendant "determine whether the clinical condition of your patient is disabling."[46] On that Statement, Dr. Welch indicated that Plaintiff's "primary diagnosis was systemic lupus

---

[41]*Id*.  at 506.

[42]*Id*.

[43]*Id*. at 509.

[44]*Id*.

[45]*Id*. at 512.

[46]*Id*. at 462-63.

erythematosus and second diagnosis was fatigue.[47]  Dr. Welch also listed "other diagnoses" of "arthralgial, tachycardia, inflammatory arthritis, seizure disorder, Raynaud's and 'SVT.'"[48]  She listed Plaintiff's symptoms as joint pain, morning stiffness, inflammation/synovitis of joints, fatigue, headaches, and seizures.[49]  In addition, Dr. Welch identified January 30, 2006 as the date she recommended Plaintiff should stop working and identified the reasons as "fatigue & very active SLE."[50]  Dr. Welch described Plaintiff's "physical, mental and cognitive limitations and work activity limitations" as "joint pain and stiffness limiting mobility, fatigue limiting work hours and activity & inflammatory arthritis."[51]  She noted that treatment was ongoing with immunosuppressive medication.[52]  The report was dated April 6, 2006.[53]

Defendant obtained other records from Plaintiff's treating physicians, including a neurologist, Dr. Elizabeth Byrniarski; a cardiologist, Dr. Martin Emert; a gynecologist, Dr. Larry Batty; and Dr. Moriarty, Plaintiff's primary care physician.[54]  None of those records express any opinion that Plaintiff was unable to work or perform the material and substantial duties of her occupation.  Moreover, none of those doctors ever imposed any restrictions or limitations upon Plaintiff's activities.

---

[47] *Id.* at 462.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 463.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.* at 270, 274, 454.

On September 7, 2006, Defendant submitted Plaintiff's medical records to a consulting doctor, Shirley Ingram, M.D., who is a board certified rheumatologist.[55] The cover memo sent to Dr. Ingram indicated that the claimant "is a 38/yo female CFO who ceased work on 1/30/06 and is claiming Disability due to systemic lupus erythematosus and fatigue. Other diagnoses noted include seizure disorder, tachycardia, inflammatory arthritis, and Raynaud's disease."[56] It further stated that "[m]edical records from Dr. Welch, Dr. Bryniarski (neurology), Dr. Moriarty (PCP) and Dr. Emert (cardiology) are available for our review at this time."[57] The memo asked Dr. Ingram to review the medical documentation available and address the following:

1. What is/are the claimant's primary conditions(s)?
2. What level of functional impairment is supported by the records; reasonable limitations and restrictions?
3. Please describe and note a reasonable duration of impairment, and prognosis for recovery.[58]

Dr. Ingram reviewed the records and responded to Defendant with a "Physician Consultant Memo" signed on September 20, 2006.[59] In that memo, Dr. Ingram noted that the claimant is a 38-year old chief financial officer who ceased work on January 30, 2006. She goes on to state: "I am asked to review her file . . . . The entire file is reviewed."[60] She then states:

Medical records are available from rheumatologist Dr. Welch from November 2, 2004 through July 2006, as well as neurology records from Dr. Bryniarski from October 29, 2004 through September 30, 2005; cardiology records from Dr. Emert

---

[55]*Id.* at 454.

[56]*Id.*

[57]*Id.*

[58]*Id.*

[59]*Id.* at 441.

[60]*Id.*

in fall 2005, and cardiology records from Dr. Kramer in February 2006; as well as gynecology records from Dr. Batty from 2003 through June 21, 2006."[61]

Dr. Ingram also noted there were "primary care records from Dr. Moriarty.[62]

According to Dr. Ingram's September 20, 2006 memo, Plaintiff's medical records showed that Plaintiff had been diagnosed with SLE, history of Raynaud's phenomenon, arthralgias, possible seizure disorder, mild episodic lymphoenia and history of photosensitive rash.[63] Dr. Ingram observed in her memo that at the time Plaintiff stopped working on January 30, 2006, Plaintiff's serologies were negative, her joint exam was normal, her SLE and arthritis conditions were stable with medication, and Plaintiff's prednisone dosage was being tapered.[64] Dr. Ingram also noted the following based on her review of the records: Plaintiff remained physically active after stopping work. Plaintiff had planned two months in advance to stop working in January 2006. Dr. Ingram also noted that there was no indication or notation in Dr. Welch's treatment records that Dr. Welch had ever recommended that Plaintiff stop working.[65]

Dr. Ingram opined that the medical records supported a possible/probable minor seizure disorder but that it was "unlikely it would be limiting for [Plaintiff's] own occupation."[66] Dr. Ingram also opined that the records "do not support an active autoimmune disease by physical exam, laboratory report, or medication change at the time of [Plaintiff's] cease work, nor is there support

---

[61]*Id.*

[62]*Id.* at 444.

[63]*Id.*

[64]*Id.*

[65]*Id.* at 444-45.

[66]*Id.*

for specific physical limitations for a full-time sedentary to light occupation."[67] Dr. Ingram observed

that Plaintiff's medications "would not be expected to be limiting, and indeed she had been on stable

medications for several months prior to her cease work, and indeed medications had been tapered

for her supraventricular tachycardia . . . ."[68] Dr. Ingram also stated:

> While chronic autoimmune disease can cause fatigue, one would expect the fatigue to be improved with the significant medication she is on, and as her complaints are static through the 2 years of these medical records, there is a higher likelihood, then, that her complaints are not related to active autoimmune disease. She has complaint of insomnia, and this may be a separate or primary contributor to her fatigue, but this would not be expected to be limiting.[69]

On September 15, 2006, Dr. Ingram wrote Dr. Welch asking for further support for

Plaintiff's asserted limitations.[70] In that letter, Dr. Ingram indicated that she is a board-certified

rheumatologist who had been asked by Defendant to review, in connection with Plaintiff's disability

claim, Dr. Welch's medical records from November 2004 through summer 2006, as well as records

from cardiologist Dr. Emert and neurologist Dr Bryniarski. Dr. Ingram stated that she could not

detect any specific change in Plaintiff's physical condition or any treatment indicating that Plaintiff

was having limitations from an active autoimmune disease.[71] Dr. Ingram further stated: "It would

be very helpful to Ms. Berges if you could respond with a brief narrative detailing any specific

findings that would support a limitation from her performing her own occupation (which may

require up to two-thirds of the day walking and standing, and on occasion lifting, carrying, pushing,

---

[67]*Id*. at 445.

[68]*Id*.

[69]*Id*.

[70]*Id*. at 431-32.

[71]*Id*. at 431.

pulling up to 10 pounds), or any other extenuating circumstances or conditions that I have overlooked in her medical records."[72]

When no response from Dr. Welch was forthcoming, Defendant informed Plaintiff in a letter dated November 1, 2006 that, based on the information Defendant had to date, Plaintiff had not provided proof of loss that supported her claim of being unable to perform the material duties of her occupation.[73]  The letter stated that although the medical information indicated Plaintiff had some "active health problems in the past," at the time she ceased work, her conditions "were well stabilized."[74]  Furthermore, the letter noted that Dr. Welch's records revealed that Plaintiff had planned in advance to take a three-month leave of absence in January 2006 to become healthier and improve her work performance.  The letter also notified Plaintiff of the review conducted by a physician consultant, Dr. Ingram, who determined that the laboratory tests and physical examinations, both before and after Plaintiff's cease work in January 2006, did not support findings of such severity to prevent Plaintiff from continuing work.[75]  Finally, the letter requested that Plaintiff ask Dr. Welch to respond to Dr. Ingram's request for additional information and that if no response was forthcoming within thirty days, Defendant would decide her claim without that information.[76]

On November 16, 2006, Dr. Welch responded to Dr. Ingram's request, stating:

---

[72]*Id.*

[73]*Id.* at 155-56.

[74]*Id.* at 156.

[75]*Id.*

[76]*Id.*

18

Mrs. Berges is a 38 year-old white female with a diagnosis of systemic lupus erythematosus. This has been manifested by a seizure disorder, inflammatory arthritis, neutopenia and a positive ANA in the past. She currently has not had active synovitis, but continues to complain of significant fatigue, memory problems, joint pain and Raynaud's.

The reason that she has told me she is unable to work is because of her severe fatigue, her joint pain and problems with her thinking. I understand that her inflammatory markers have recently been normal and that her disease modifying medications do appear to be controlling the inflammatory component of her disease, but she continues to have these other problems.[77]

Dr. Ingram reviewed Dr. Welch's November 16, 2006 letter and informed Defendant that the additional information provided did not alter her earlier conclusions.[78] Dr. Ingram stated: "Ms. Berges does not have a physical condition that limits or restricts her from her own full-time light occupation as a chief financial officer. There is no additional physical exam, radiologic or laboratory test that provides further documentation for specific limitations beyond what I have reviewed previously."[79]

Thereafter, Plaintiff's claim file was reviewed by one of Defendant's Vocational Case Managers, Jeffery Smith, who has a Bachelor of Science Degree in vocational Rehabilitation and is a Certified Disability Management Specialist.[80] Mr. Smith relied upon the Dictionary of Titles ("DOT") 186.117-054 in determining whether Plaintiff could perform the occupation of Chief Financial Officer. Mr. Smith stated in his November 29, 2007 report that DOT 186.117-054 "best identifies the claimant's Own Occupation [of chief financial officer] based on information provided

---

[77]*Id*. at 429.

[78]*Id.* at 426.

[79]*Id.*

[80]*Id*. at 1708-09.

on the job description, the Employer's Statement, the Employee's Statement, and correspondence

from the claimant to the Disability Benefits Analyst dated August 28, 2006 . . . ."[81]

Attached to the vocational consultant's report was a printout for DOT 186.117-054, which

provided the following description of job duties for "Chief Financial Officer (financial)":

> Plans, develops, and directs financial policies and practices of bank, savings bank, commercial bank, trust company, mortgage company, credit union, or company dealing in consumer credit, such as finance company, to ensure that financial objectives, goals, and institutional growth are met and in accordance with policies of Board of Directors or corporate charter and government regulations: Plans and develops investment, loan, interest, and reserve policies to ensure optimum monetary returns in accordance with availability of investment funds, government restrictions, and sound financial practices. Coordinates communication and reporting activities between divisions, departments, and branch offices to ensure availability of data required for efficient daily operations. Delegates to subordinate corporate officers authority for administering activities and operations under their control. Reviews reports and financial statements to determine policy changes due to changes in economic conditions. May serve as bank representative in professional, business, and community organizations to promote bank services. May plan budget and monitor financial activities, using computer. May serve on Board of Directors. May be designated according to type of financial institution as President, Commercial Bank (financial); President, Credit Union (financial); President, Finance Company (financial); President, Mortgage Company (financial); President, Savings Bank (financial); President, Trust Company (financial).[82]

The vocational consultant's report also showed that DOT 186.117-054 identifies the physical

demands of the job as: "Strength: Sedentary. Exert force to 10 lbs. occasionally, or a negligible

amount of force frequently to lift, carry, push, pull, or move objects. Other Physical Demands: CL -

Climbing - Not Present."[83] Mr. Smith thus determined that Plaintiff's "own occupation is considered

---

[81]*Id.* at 1704-05.

[82]*Id.* at 1704.

[83]*Id.*

20

sedentary as it is performed in the general economy."[84]  He noted that although the Plaintiff's own

job appeared to require overseas travel, "jobs within her own occupation do exist where this type

of extensive travel would not be required."[85]

In a November 30, 2006 letter ("Denial Letter"), Defendant informed Plaintiff that her claim

for LTD benefits was denied.[86]  The Denial Letter informed Plaintiff that Defendant had received

Dr. Welch's response to the physician consultant's (Dr. Ingram) request for information to provide

specific findings that would support impairment from Plaintiff's "own occupation."[87]  The Denial

Letter further stated that while Dr. Welch's response had confirmed her SLE diagnosis and that

Plaintiff had reported being unable to work, Dr. Welch had concurred with the physician

consultant's findings "that your inflammatory markers have been normal and your medications do

appear to be controlling your disease."[88]  The Denial Letter informed Plaintiff that the physician

consultant had reviewed Dr. Welch's November 16, 2006 response and concluded that the response

did not (1) alter her previous understanding of Plaintiff's medical records, and (2) did not support

Plaintiff's claim that she is unable to continue working.  Defendant reiterated the physician

consultant's finding that Plaintiff's laboratory tests and physical examinations, both before and after

---

[84]*Id.* at 1705.

[85]*Id.* at 1704-05.

[86]*Id.* at 218-220.

[87]*Id.* at 218.

[88]*Id.*

her January 30, 2006 cease work date, did not support findings of such severity to prevent Plaintiff from performing sedentary work.[89]

The Denial Letter also informed Plaintiff of the vocational consultant's finding that Plaintiff's "own occupation" was that of chief financial officer, which qualifies as sedentary work as it is performed in the general economy.[90]  The Denial Letter stated that although Plaintiff's own job appeared to require overseas travel, the vocational consultant found that jobs within Plaintiff's "own occupation" exist in the economy that do not require extensive travel.[91]  Defendant also informed Plaintiff that while her particular job had required regular overseas travel, this was not a material duty of her "own occupation," and, thus, the inability to travel extensively did not provide a basis for disability under the LTD Plan.[92]

The Denial Letter summarized Defendant's conclusion as follows:

In order to be entitled to disability benefits, the information in the file must provide Proof of Loss which supports that you have been unable to perform with reasonable continuity the Material Duties of your Own Occupation.  While the medical information in the file indicates that you have had some active health problems in the past, at the time you ceased work your conditions were well stabilized.  Dr. Welch confirms that you had planned a three month leave of absence beginning in January 2006 to become healthier and to improve work performance.[93]

The Denial Letter then informed Plaintiff that, on the basis of this information, Defendant had concluded that Plaintiff had not provided sufficient proof of loss to support that she was unable

---

[89] *Id.*

[90] *Id.* at 218-19.

[91] *Id.*

[92] *Id.* at 219.

[93] *Id.*

to perform with reasonable continuity the material duties of her "own occupation" of chief financial officer. Her claim was therefore denied.[94]

    2.    *Plaintiff's appeal and the review conducted by the Benefits Department*

On May 22, 2007, Plaintiff appealed Defendant's denial of her claim by submitting a written request for review.[95] The review was conducted by the Benefits Review Department of Defendant.

On July 3, 2007, Plaintiff's counsel provided to the Benefits Review Department a 2007 vocational report by Lesa Keen, along with a number of medical records, including a May 14, 2007 psychological evaluation by David Mouille, Ph.D. Plaintiff's counsel also submitted additional records from Dr. Welch, including a May 18, 2007 narrative report of Dr. Welch.[96] Plaintiff submitted this information in support of her contention that her SLE and arthritis were disabling on January 30, 2006 and that newly diagnosed medical conditions of dementia and depression were also disabling.

The May 14, 2007 psychological evaluation completed by Dr. Mouille, who is a licensed psychologist but not board certified, identified dementia as the primary psychiatric diagnosis and depression as a secondary diagnosis.[97] The Benefits Review Department requested a physician consultant, Dr. Linda Toenniessen, who is board certified in psychiatry, to review Dr. Mouille's evaluation. Dr. Toenniessen found that the evaluation "is remarkable for the extent to which normal

---

[94]*Id.*

[95]*See id.* at 146.

[96]*Id.* at 140-41.

[97]*Id.* at 388.

23

performance is documented."[98]  According to Dr. Toenniessen, the evaluation showed that Plaintiff's "intelligence testing is high average."[99]  Dr. Toenniessen found that Plaintiff's normal performance on testing did not support a finding that Plaintiff had a mental impairment that would prevent her from working in her own occupation of chief financial officer.[100]  Dr. Toenniessen also found that Dr. Mouille's evaluation did not support a diagnosis of major depression or dementia.[101]

Defendant also asked Dr. Ingram, the board-certified rheumatology physician consultant who had previously reviewed Plaintiff's medical records, to review the additional medial records Plaintiff's counsel submitted on July 3, 2007.  Dr. Ingram provided a Physician Consultant Memo signed July 21, 2007.[102]  Dr. Ingram identified the following medical records that she reviewed: (1) medical records of office visits to Dr. Welch on August 3, October 5 and December 19, 2006, and February 21, 2007, along with a May 18, 2007 letter from Dr. Welch addressed "To Whom It May Concern"; (2) record of Dr. Higgins from June 2, 2006; (3) laboratory tests from June, November 2, and December 19, 2006, and January 10, 2007, and laboratory flow sheets from 2006, including a December 19, 2006 flow sheet; (4) records of Dr. Amundson from October 4, November 4, and December 20, 2006 and February 20, 2007; (5) MRI on October 9, 2006; (6) gynecology records of Dr. Batty from October 11, 2006 to February 20, 2007; (7) physical therapy notes from February 8, 2005 to January 4, 2007; (8) neurology records of Dr. Arthur Allen, II on August 8, 2001 and January 8, 2007; (9) cardiology records of Dr. Kramern Crouse on July 19 and November, 2005 and

---

[98]*Id*. at 418.

[99]*Id.*

[100]*Id*.

[101]*Id.*

[102]*Id.* at 405-09.

February 24, 2006; and (10) phone call records of Dr. Emert for March 2006.[103] She also indicated she had reviewed the vocational report of Lesa Keen dated June 7, 2007.[104]

Dr. Ingram stated in her July 21, 2007 memo that these records did not support a finding that Plaintiff has any active autoimmune disease while Plaintiff remains on treatment.[105] She also found that the submitted orthopedic evaluation for back and leg pain showed improvement with epidural steroid injections and that Plaintiff had no significant neurologic abnormalities, either on examination or on MRI.[106] Dr. Ingram also found that Plaintiff's seizure disorder was well controlled on medications. In addition, Dr. Ingram observed that the only significant change in Plaintiff's medical condition was that Dr. Welch had placed her on Cymbalta for chronic pain and antidepressants in the spring of 2007.[107] Dr. Ingram concluded that the additional records did not change her earlier conclusion that "there is no support for a physical condition that would be expected to limit or restrict a full-time light occupation as of her cease work date."[108] She did note, however, Plaintiff's complaint of increased low back and leg pain in October of 2006 and found that during the period October through December 2006 Plaintiff might not have been able to work in a full-time light occupation.[109] At the same though, she noted there were no EMGs, NCVs, MRIs or physical exams finding an actual neurogenic impingement causing abnormalities. She stated that

---

[103]*Id*. at 405-09.

[104]*Id.* at 409.

[105]*Id.*

[106]*Id.*

[107]*Id.*

[108]*Id.*

[109]*Id.*

"[w]ith her improvement as of January 2007, there is no longer expected to be a restriction for a full-time light occupation."[110]

In August 2007, Defendant requested one of its Vocational Case Managers, Sandy Johnson, who had not previously reviewed Plaintiff's file, to issue a vocational report. Ms. Johnson has a Master's degree in Education and is a Certified Rehabilitation Counselor.[111] Ms. Johnson reviewed Plaintiff's "own occupation" and job description and the earlier report by the vocational specialist Jeffery Smith.[112] Ms. Johnson then issued a report dated August 22, 2007, which stated:

> The U.S. Department of Labor *Dictionary of Occupational Titles* occupation of chief Financial Officer (DOT # 186.117-054) had been assigned as the DOT that corresponds with Ms. Berges' own job by Jeffrey D. Smith, Vocational Case Manager, on 11/29/2006. No additional vocational information has been submitted since that time and the undersigned agreed with this determination as based on a review of the job description in the file from the claimant's employer . . . .

> [The job description] already received from the employer on 7/25/2006 . . . describes a number of duties such as negotiating contracts, performing marketing, setting up offshore funds, analyzing executed stock trading ideas, analyzing and projecting performance of long term equity holdings, analyzing investment ideas, managing and tracking venture capital, and tracking treasury and municipal bonds, purchase agreements, and fund performance. The job also involved managing the audit process, managing tax preparation, and supervising personnel including the controller, the business manager, and the analyst. These job duties would correspond with the duties listed in the DOT Chief Financial Officer, as they include overall management functions, supervision, analyzing the performance of holdings, etc.[113]

Ms. Johnson noted that she had also reviewed Dr. Ingram's August 13, 2007 report which indicated Plaintiff would have been be able to work a light capacity job on a full time basis with the

---

[110]*Id.*

[111]*Id.* at 1702.

[112]*Id.* at 1700.

[113]*Id.*

exception of October 2006 through December 2006 due to back and leg pain.[114] Ms. Johnson also noted that she had reviewed Dr. Toenniessen's July 16, 2007 memo in which she indicated that she did not concur with Mr. Mouille's conclusions and in which she found Plaintiff had high average intelligence and normal performance on the testing.[115] Ms. Johnson concluded that Plaintiff "retains the mental ability to perform the occupation of Chief Financial Officer."[116]

Ms. Johnson also reviewed the June 7, 2007 vocational report of Lesa Keen that Plaintiff's counsel had provided to the Benefits Review Department. Ms. Johnson noted that Ms. Keen's conclusion that Plaintiff would appear incapable of obtaining and maintaining full-time competitive employment was based only on observations made during Ms. Keen's meeting with Plaintiff and on the psychological evaluation of Dr. Mouille.[117] Ms. Keen observed that Plaintiff forgot some of their appointments and had difficulty recalling all of her employment history. Ms. Johnson stated that "[n]one of these observations would lead me to change my conclusion that Ms. Berges is able to perform her occupation of Chief Financial Officer given the functional capacities outlined by Drs. Ingram and Toenniessen."[118] Ms. Johnson also noted that Ms. Keen did not address whether Plaintiff was able to perform any occupations or work part-time, and failed to conduct any vocational testing or labor market research.[119]

---

[114]*Id*. at 1700-01.

[115]*Id*. at 1701.

[116]*Id.*

[117]*Id.*

[118]*Id.*

[119]*Id.*

Defendant notified Plaintiff's attorney in a letter dated August 30, 2007 that the Benefits Review Department found the additional information Plaintiff had provided insufficient to change its original decision to deny benefits.[120] Defendant's letter set forth the above findings and conclusions of Dr. Toenniessen, Dr. Ingram, and the vocational case manager, Sandy Johnson.[121] The letter also noted that Dr. Mouille's psychological evaluation took place on May 14, 2007, approximately sixteen months after Plaintiff stopped working and claimed disability. The letter observed that Dr. Mouille never asserted that Plaintiff was mentally impaired on January 30, 2006 (the last day Plaintiff worked), and thus, even if there were a consensus of opinion that Plaintiff was *currently impaired*, this would not warrant a reversal of Defendant's decision that she was not impaired on *January 30, 2006*.[122] In addition, the letter pointed out even if Defendant were to agree with Dr. Mouille's conclusion that Plaintiff was presently impaired, "[Plaintiff's] insurance ended on February 28, 2006 at the latest, assuming she was on an approved leave of absence following the date she ceased to be a member and she would be ineligible for any benefits on that basis as well."[123] Defendant informed Plaintiff's counsel that "based on this understanding of the pertinent medical and vocational information," Defendant had not changed its conclusion that Plaintiff had the functional capacity to perform the material duties of her own occupation of CFO during the relevant time period.[124]

---

[120]*Id*. at 133-36.

[121]*Id.* at 134-35.

[122]*Id*. at 134.

[123]*Id.*

[124]*Id*. at 135.

Although its decision to deny Plaintiff's claim had not changed, Defendant informed Plaintiff's counsel that her file would be forwarded to Defendant's Administrative Review Unit for yet another review.[125]

### 3. Review by Defendant's Administrative Review Unit

At this stage of the review process, Defendant provided Plaintiff's medical records to two consulting physicians, Douglas M. Haselwood, M.D. and Laurence M. Binder, Ph.D. Dr. Haselwood is a Diplomate, American Board of Internal Medicine and Rheumatology, and Fellow, American College of Rheumatology. On October 18, 2007, Defendant asked Dr. Haselwood to conduct an independent rheumatology file review of Plaintiff's records and to address sixteen specific issues, including such issues as: (1) does the medical information in Plaintiff's file support a diagnosis of SLE, and (2) does the information provided support a severity of arthritis symptoms at any time from January 20, 2006 to the present that would preclude full-time sedentary work activity?[126] Defendant informed Dr. Haselwood that Plaintiff was 39 years old and employed from November 24, 1997 to January 30, 2006 as "a CFO."[127]

After reviewing Plaintiff's medical records, Dr. Haselwood provided Defendant with a written report dated November 8, 2007.[128] In that report, Dr. Haselwood stated:

> I am submitting this report outlining my findings and conclusions generated from a review of medical records pertaining to Marcey Berges. This record review was focused on defining the nature and severity of Ms. Berges' chronic

---

[125]*Id.*

[126]*Id*. at 339-42.

[127]*Id*. at 339.

[128]*Id*. at 315-25.

rheumatologic/medical afflictions in the context of objectively defining pathophysiologic parameters of long-term vocational physical disability.[129]

He further stated that "[a] little over six inches of records pertaining to Ms. Berges were submitted for review and these were collated by date and source . . . . All record entries were personally reviewed, but non-relevant, duplicative, illegible or undated material may not have received citation."[130]

Dr. Haselwood then proceeded to identify the following medical records that he had reviewed of the following health care providers:

**1.** **Kathryn Welch, M.D. Treating Rheumatologist**

initial comprehensive consultation report dated 10/26/01
summary letter dated 10/06/03
report dated 02/02/05
report dated 2/17/05
report of 03/08/05
report dated 05/04/05
report dated 06/03/05
report dated 07/29/05
report dated 09/23/05
report dated 11/29/05
report dated 01/26/06
note dated 03/23/06
note dated 5/26/06
report dated 08/03/06
report dated 10/05/06
letter dated 11/16/06
report dated 12/19/06
report dated 02/21/07
letter dated 5/18/07

**2.** **Shirley Ingram, M.D., Rheumatologist**

letter dated 09/15/06
memo of 09/15/06

---

[129]*Id.* at 315.

[130]Id.

memo of 11/26/06
final memo of 08/13/07

**3.**     **Mid-America Cardiology**

serial cardiology consultation and treatment reports from 06/21/01 through 11/30/05
final cardiology note of 11/20/05

**4.**     **Linda Toenniessen, M.D., Psychiatrist**

memo dated 07/15/07

**5.**     **Glenn Amundson, M.D.**

consultation report dated 10/04/06
follow-up report of 11/04/06

**6.**     **Kimber Eubanks, M.D.**

report dated 11/14/06
report dated 11/20/06
report dated 12/06/06

**7.**     **Elizabeth Bryniarski, M.D., Neurologist**

consultation of 08/14/04
EEG report dated 11/05/04
EEG report dated 02/22/06

**8.**     **Arthur Allen, II, M.D., Neurologist**

consultation report dated 01/08/07

**9.**     **David Bodensteiner, M.D., Hematologist**

consultation report dated 04/18/01

**10.**     **Sharon Lynch, M.D., Neurologist**

consultation report of 12/22/00

**11.**     **Lisa Keen, Rehabilitative Consultant**

Rehabilitation Services vocational report dated 06/07/07

**12.**     **Kramer and Crouse, Cardiology**

Serial consultation, treatment and procedural notes from March of 20025 through 02/22/06

**13.     Diagnostic Imaging Studies**

06/03/98 lumbar spine MRI scan
02/08/01 cervical spine MRI study
10/04/06 lumbar spine x-ray
10/09/06 cervical spine MRI scan
10/09/06 lumbar spine MRI scan

**14.     Diagnostic Laboratory Studies**

10/19/01
08/13/02
05/14/04
03/01/05
10/27/05
11/29/05
01/26/06
04/20/06
06/26/06
at least 10 studies from 06/23/06 through 02/21/07

**15.     Legal Submission** (author unknown)[131]

An 86-page document entitled "Facts Supporting Claimant's Meeting the Definition of Disability and Rebutting Denial Rationale"[132]

After reviewing and providing a written analysis of these records, Dr. Haselwood opined in his November 8, 2007 written report as follows:  "Based on the currently available medical record rheumatologic evidence, Ms. Berges should have the physical capacity to perform full-time gainful employment involving a full range of sedentary to light physical activities."[133]  He further opined

---

[131]Although the author was unknown to Dr. Haselwood, the record is clear that these were articles and documents submitted to Defendant by Plaintiff's attorney.  *See id.* at 1207-92.

[132]*Id.* at 315-321.

[133]*Id.* at 323, 324.

that the above-cited medical records did not support a diagnosis of SLE.[134]  He explained that the American College of Rheumatology requires "a minimal four out of eleven diagnostic criteria for SLE."[135]  He found that the medical records substantiated only two criteria, arthritis and leukopenia.[136]  He also found that the medical records did not support Plaintiff's reported symptoms of Raynaud's syndrome.[137]

Furthermore, Dr. Haselwood opined in his report that it was not reasonable to conclude that Plaintiff's chronic undifferentiated rheumatic disease "would cause sustained or vocationally debilitating fatigue."[138]  He also opined that Plaintiff's medical records did not document any seizure activity during the time period January 30, 2006 through November 8, 2007, or that a seizure disorder in any way impaired her vocational functionality during that same period.[139]  In addition, he stated that the medical records did not support the conclusion that objectively substantiated medical/rheumatologic pathophysiology was of such severity so as to preclude Plaintiff from engaging in full-time sedentary work activity.[140]

On October 18, 2007, Defendant also asked Dr. Laurence Binder to conduct an independent neuropsychological file review of Plaintiff and to address nine specific questions about Dr.

---

[134]*Id*. at 321

[135]*Id*. at 321-22.

[136]*Id*. at 322.

[137]*Id*. at 324.

[138]*Id*. at 323.

[139]*Id*. at 325.

[140]*Id*.

Mouille's neuropsychological report.[141]  One of those questions was whether Dr. Mouille's evaluation supported a finding that Plaintiff met the primary criterion for a diagnosis of dementia.[142] Several of the questions dealt with Plaintiff's cognitive function, and Defendant asked Dr. Binder to comment on any significant findings during Dr. Mouille's evaluation and what they support in terms of cognitive functional impairment.[143]

Dr. Binder, who is a Diplomate in clinical neuropsychology, submitted a written report to Defendant on November 26, 2007.[144]  In that report, Dr. Binder indicated that he had asked Dr. Mouille to provide him with the raw data underlying his evaluation, but he was told that the data was "unobtainable."[145]  Dr. Binder proceeded to answer the questions posed by Defendant but qualified his answers as needed due to the lack of the underlying raw data.  Dr. Binder expressed concern about the accuracy of the scores Dr. Mouille had provided in his report.  Dr. Binder found that there was no support for the inference that Plaintiff has a deficit in executive functioning.  He also found that she does not meet the criteria for dementia because "there is no area of cognitive impairment."[146] Moreover, he noted that Dr. Mouille provided no documentation of "any actual cognitive difficulty performing the job of chief financial officer."[147]

---

[141]*Id.* at 343-46.

[142]*Id.* at 345.

[143]*Id.*

[144]*See id.* at 352-62.

[145]*Id.* at 352.

[146]*Id.* at 356.

[147]*Id.* at 356-57.

Dr. Binder opined that "[b]y any reasonable standard, the neuropsychological test results obtained on [Plaintiff] were normal."[148]  He also stated that he was unable to find any evidence of depression in Dr. Mouille's test results other than a mild elevation on one test, and that could have been caused purely by physical complaints.[149]  Dr. Binder also found no evidence that her depression or reported "psychopathology" impairs her ability to perform activities of daily living, the pace at which Plaintiff can understand and perform simple tasks.  Nor was there any evidence that it affects her ability to concentrate or maintain an adequate schedule through an average workday.[150]

After making this report, Dr. Binder was eventually able to obtain the raw data underlying Dr. Mouille's evaluation, and he provided an additional report to Defendant.[151]  After reviewing the raw data, he continued to express reservations about the accuracy of the scores provided by Dr. Mouille, and he noted the raw data revealed more errors than he originally observed.[152]  Dr. Binder explained the errors he found in the raw data, and observed that those errors "raise additional concerns about the competence of Dr. Mouille."[153]  He stated: "My opinion that there is no basis for diagnosing depression was strengthened by the raw data, and my concerns about the competence of

---

[148]*Id.* at 358.

[149]*Id.* at 360.

[150]*Id.*

[151]*See id.* at 305-06.

[152]*Id.* at 305.

[153]*Id.*

Dr. Mouille were heightened by additional errors detected in the raw data."[154]  He concluded that the raw data did not change his original interpretation or opinions.[155]

In a letter dated March 11, 2008, Defendant notified Plaintiff's counsel that the Administrative Review Unit had completed it is review and had concluded that the Benefits Department's decision to deny Plaintiff benefits was correct and would be upheld.[156]  The letter, which was twenty pages long, provided a detailed review and analysis of the medical records, reports and evaluations. It discussed in extensive detail the rheumatology records, neurology records, orthopedic records, cardiology and cardiovascular disease records of Plaintiff's treating physicians; Dr. Mouille's neuropsychological testing; the reports of the independent physician consultants, including Dr. Ingram, Dr. Haselwood, and Dr. Binder; and the vocational evaluations performed by Lesa Keen and Sandy Johnson.[157]

Some of the more significant points in the letter were as follows.  Dr. Ingram did not find information in the file supporting impairment to a degree that would preclude Plaintiff from performing light work activity.[158]  Dr. Ingram had asked Plaintiff's treating rheumatologist, Dr. Welch, to provide a narrative detailing any specific findings that would support that Plaintiff had been prevented from performing her own occupation or any other extenuating circumstances or conditions that Dr. Ingram might have overlooked in Plaintiff's medical records.  In response, Dr. Welch reiterated that Plaintiff *had told her* she was unable to work because of fatigue, joint pain and

---

[154]*Id*. at 306.

[155]*Id.*

[156]*Id*. at 63.

[157]*Id*. at 63-82.

[158]*Id*. at 71.

problems with her thinking. Dr. Welch, however, never rendered any opinion herself that Plaintiff was incapable of performing her regular work activity based on any clinical assessment.[159] Dr. Welch's response did not change Dr. Ingram's prior opinion that the medical records did not support impairment to a degree precluding full-time light work activity.[160]

In addition, Defendant's letter noted that Dr. Haselwood did not find that the medical information supported active SLE or even the diagnostic criteria of SLE as outlined by the American College of Rheumatology. While he did note that Plaintiff had age-appropriate osteoarthritis and discogenic disease in her neck and low back, the medical information did not support impairment to a degree precluding Plaintiff from performing sedentary to light work activity.[161]

Defendant stated in its letter that the Administrative Review Unit found the opinions of Dr. Ingram and Dr. Haselwood to be well reasoned and well supported by the medical information in Plaintiff's file.[162] Defendant further stated that although the medical records showed evaluation and/or treatment for SLE, Raynaud's, and arthritis dating back several years, there was no documented significant change in Plaintiff's clinical presentation or in her reported symptoms, and no significant change in Plaintiff's recommended treatment.[163] Thus, the Administrative Review Unit had concluded that the medical information in Plaintiff's file did not support that she was unable to perform the material duties of her own occupation as a CFO after January 30, 2006.[164]

---

[159]*Id.* at 72-73.

[160]*Id.* at 73.

[161]*Id.* at 73-74.

[162]*Id.* at 75.

[163]*Id.* at 76.

[164]*Id.*

With respect to Plaintiff's newly asserted mental impairment, Defendant noted that Plaintiff did not indicate in her July 2006 claim statement that her inability to work was in any way due to mental or cognitive impairment.[165] Further, Defendant noted that Dr. Binder had reviewed Dr. Mouille's neuropsychological evaluation and found that Dr. Mouille's conclusions regarding Plaintiff's cognitive functioning, dementia, and depression were not supported by Dr. Mouille's own test findings.[166] Furthermore, after reviewing the raw data, Dr. Binder even questioned Dr. Mouille's competence.[167] Defendant concluded that although Dr. Mouille had asserted Plaintiff has cognitive impairment to a degree preventing her from working in any capacity, by his own report, Plaintiff did not demonstrate any significant deficiency on neuropsychological testing.[168]

Finally, Defendant discussed the vocational evaluations of Plaintiff. Defendant analyzed the report of Lesa Keen, which had been submitted by Plaintiff. Defendant noted that Ms. Keen's evaluation was based only on her interview of Plaintiff and her review of Dr. Mouille's evaluation. While Ms. Keen reached a conclusion that Plaintiff is incapable of working, she based that conclusion only on (1) Plaintiff's self-report that she could not work; (2) Ms. Keen's observation that Plaintiff was fatigued during the interview; (3) Plaintiff's difficulty in remembering employment dates during the interview; and (4) Dr. Mouille's report, which Defendant found to be of questionable value.[169] Defendant thus concluded that Ms. Keen's interview and review did not

---

[165]*Id.* at 76.

[166]*Id.*

[167]*Id.*

[168]*Id.* at 80.

[169]*Id.* at 81.

constitute a vocational evaluation and did not add substantial information supporting Plaintiff's appeal.[170]

Defendant then discussed the occupation of chief financial officer. It noted that the occupation requires the ability to perform sedentary work, which Drs. Ingram and Haselwood had found Plaintiff could perform. Defendant noted that although Plaintiff may have been required to travel internationally while employed by KCM, "the occupation of Chief Financial Officer, as it is performed [in] that general economy, would not require international travel."[171]

Based on the foregoing, Defendant informed Plaintiff's counsel that it did not find support for Plaintiff's claim that she was unable to perform with reasonable continuity the material duties of her own occupation. Defendant therefore determined that its decision to deny Plaintiff disability benefits was correct and would be upheld.[172]

## V.    Legal Standard of Review Under ERISA

Having reviewed the extensive record in this case, the Court will now turn its attention to the legal standard it must apply to determine whether Defendant's decision to deny Plaintiff disability benefits should be overturned.

ERISA provides a detailed and comprehensive set of federal regulations governing the provision of benefits to employees by employers, including disability benefits.[173]   ERISA specifically gives a plan beneficiary the right to federal court review of benefit denials and

---

[170]*Id.*

[171]*Id.*

[172]*Id.* at 82.

[173]*Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1200 (10th Cir. 2002).

terminations.[174] The statute, however, does "not establish the standard of review for such decisions."[175]

In *Firestone Tire & Rubber Co. v. Bruch*,[176] the Supreme Court established the basic framework for determining the standard of review in ERISA cases that challenge the denial or termination of benefits. The Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[177] If discretionary authority exists, then the proper standard of review is a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.[178]

In applying the arbitrary and capricious standard, "the decision will be upheld so long as it is predicated on a reasoned basis."[179] Under this standard, there is no requirement that the basis relied upon be the only logical one or the best possible one.[180] The reviewing court only inquires whether the administrator's decision resides "somewhere on a continuum of reasonableness even

---

[174]*Id.* (citing 29 U.S.C. § 1132(a)).

[175]*Id.* (citing *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 824-25 (10th Cir. 1996)).

[176]489 U.S. 101 (1989).

[177]*Id.* at 115.

[178]*Id.*; *Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

[179]*Adamson*, 455 F.3d at 1212 (citing *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)).

[180]*Hancock v. Metropolitan Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009) (quoting *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan,* 379 F.3d 1168, 1176 (10th Cir. 2004)).

if on the low end."[181]  In other words, "[t]he decision will be upheld unless it is not grounded on any reasonable basis."[182]  Consequently, the Tenth Circuit has observed that the arbitrary and capricious standard "is a difficult one for a claimant to overcome."[183]

"Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary."[184]  The term "substantial evidence" means "evidence of a sort that a reasonable mind could accept as sufficient to support a conclusion."[185]  It means more than a scintilla, yet less than a preponderance.[186]  The substantiality of the evidence must be evaluated "against the backdrop of the administrative record as a whole."[187]

The Supreme Court in *Metropolitan Life Insurance Co. v. Glenn*[188] recently analyzed how the arbitrary and capricious standard should be applied when a plan administrator "both evaluates claims for benefits and pays benefits claims."[189]  The Court held that in such a case there is a conflict of interest, which "should be weighed as a factor in determining whether there is an abuse of

---

[181]*Adamson*, 455 F.3d at 1212 (citing *Kimber*, 196 F.3d at 1098).

[182]*Hancock*, 590 F.3d at 1155 (quoting *Finley*, 379 F.3d at 1176).

[183]*Nance v. Sun Life Assur. Co. of Canada*,  294 F.3d 1263, 1269 (10th Cir. 2002).

[184]*Hancock*, 590 F.3d at 1155 (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)).

[185]*Adamson*, 455 F.3d at 1212.

[186]*Id.*

[187]*Id.*

[188] ___ U.S. ___, 128 S.Ct. 2343, 171 L.Ed. 2d 299 (2008).

[189]*Id.*, 128 S.Ct. at 2350.

discretion."[190]  The presence of a conflict of interest may "act as a tiebreaker when the other factors are closely balanced," with "the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance."[191]  The Court rejected earlier lower court conflict of interest decisions that shifted the burden to the administrator to show that its benefit denial was reasonable and not arbitrary and capricious.[192]

The Tenth Circuit has interpreted *Glenn* "to embrace a 'combination-of-factors method of review' that allows judges to take account of several different, often case-specific, factors, reaching a result by weighing all together."[193]  Applying *Glenn*, the Tenth Circuit has held that "a conflict of interest affects the outcome at the margin, when we waver between affirmance and reversal."[194]  It has also held that "[a] conflict is more important when circumstances suggest a higher likelihood that it affected the benefits decision, but less so when the conflicted party has taken active steps to reduce potential bias and to promote accuracy."[195]

In this case, the parties do not dispute that the Court should apply the arbitrary and capricious standard of review.  Furthermore, the Court finds the arbitrary and capricious standard to be appropriate here because the LTD Plan gives Defendant the discretionary authority to determine

---

[190]*Id.* (citations omitted).

[191]*Id.* at 2351.

[192]*Id.*

[193]*Graham v. Hartford Life & Acc. Ins.* Co., 589 F.3d 1345, 1358 (10th Cir. 2009) (quoting *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009)).

[194]*Hancock*, 590 F.3d at 1155.

[195]*Id.* (quoting *Glenn*, 128 S.Ct. at 2351).

eligibility for benefits and to construe the terms of the LTD Plan.[196]   In addition, Defendant does not dispute that it both evaluates claims for benefits and pays benefits claims.[197]  Thus, under *Glenn*, Defendant is deemed to operate under a conflict of interest.

In light of the above, the correct standard of review to be applied in this case is the arbitrary and capricious standard; however, in applying that standard, the Court will take into account Defendant's conflict of interest.  In doing so, the Court will consider whether the circumstances of this particular case suggest a higher likelihood that the conflict affected Defendant's decision to deny benefits.  In the event the Court wavers between affirming and reversing Defendant's decision, the Court may rely on the presence of the conflict in reversing.

## VI.    Analysis

As noted above, Plaintiff asserts seven reasons as grounds fro the Court to overturn Defendant's decision to deny Plaintiff benefits under the LTD Plan.  The Court will analyze each of these reasons in turn.

### A.    Definition of Disability

Plaintiff argues, in both her response to Defendant's motion and in her brief in support of her Motion for Summary Judgment, that Defendant's decision to deny Plaintiff benefits should be overturned because Defendant has failed to define "disability."  Plaintiff argues in both of her briefs:

---

[196]The LTD Plan provides that Defendant has the "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."  Admin. Rec. at 56.

[197]The LTD Plan provides that "[s]ubject to the terms of the Group Police, Standard will pay the LTD Benefit described . . . . upon receipt of satisfactory written proof that you have been become Disabled . . . ."  *Id.* at 32.  The LTD Plan also states that Defendant has the right to determine eligibility for insurance, entitlement to benefits, the amount of benefits payable, and the sufficiency and the amount of information it may reasonably require to determine the above.  *Id.* at 56.

It is interesting to note [Defendant] Standard, though quoting extensively from selected portions of the policy, omitted a key covenant, i.e. the definition of disability.

The policy provides in part, "Definition of Disability[.] The Definition of Disability applicable to you will be the definition approved for your Employer by Standard. See your Certificate Label."

For this reason alone, the Motion of Standard should be denied. Standard has asserted nothing regarding the 'definition approved for your employer.' What is that definition?[198]

The Court finds this argument to be without merit. As even Plaintiff acknowledges, the LTD Plan states that "[t]he definition of Disability applicable to you will be the definition approved for your Employer by [Defendant]."[199] Furthermore, the LTD Plan directs the participant to "[s]ee your Certificate Label."[200] Plaintiff's Certificate Label is a one-page document that is included in the Administrative Record.[201] The Certificate Label lists Plaintiff's name, Member ID, employer name and address and other pertinent information.[202] It also states: "60% PREDISABILITY EARNINGS: $2500 MONTHLY MAXIMUM; 90 DAY ELIMINATION PERIOD; 80/80 DEFINITION; MEMBER DEFINITION 1."[203] The Court finds that anyone reading the Certificate Label should understand that the "80/80 Definition" is the definition applicable to Plaintiff.

---

[198]Pl.'s Resp. to Def.'s Mot. for J. on the Admin. Rec. (doc. 23) at 18 (citation to Admin. Rec. deleted); Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 11 (citation to Admin. Rec. deleted).

[199]Admin. Rec. at 32.

[200]*Id.*

[201]*Id.* at 23.

[202]*Id.*

[203]*Id.* at 23.

Furthermore, the LTD Plan explains the 80/80 Definition. In the subsection of the LTD Plan entitled "Definition of Disability," three definitions are provided: (1) "The Own-OCC to Age 65 Definition," (2) "The 80/80 Definition," and (3) "The 80/50 Definition."[204]

The Court's review of the Administrative Record reveals that Defendant consistently applied "The 80/80 Definition" to Plaintiff. Furthermore, the record reveals that Plaintiff was clearly informed that this was the definition being applied to her claim. For example, in the November 1, 2006 letter from Defendant explaining that they needed additional information from Dr. Welch, Defendant expressly informed Plaintiff that they were applying "The 80/80 Definition" of disability to her. That letter stated:

> We are writing in regard to your Long Term Disability (LTD) claim with Standard Insurance Company (The Standard).
>
> In order to be entitled to LTD Benefits you must be Disabled as defined by the terms of your Group Plan. Your Plan defines a Disability, in part, as follows:
>
> DEFINITION OF DISABILITY
>
> THE 80/80 DEFINITION
>
> > Until LTD Benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily Injury, or Pregnancy, you are either:
> >
> > a. Unable to perform with reasonably continuity the material duties of your own occupation; or
> > b. Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own occupation.[205]

Defendant also identified the disability definition being applied to Plaintiff in its March 11, 2008 correspondence to Plaintiff's attorney in which Defendant informed Plaintiff that the

---

[204]*Id.* at 32-33.

[205]*Id.* at 154.

Administrative Review Unit was upholding the denial of her benefits.[206]  In that letter, Defendant

stated:

> As explained in prior correspondence, to be eligible for LTD benefits, Ms. Berges must meet the Definition of Disability.  Ms. Berges's Group Plan states the following:
>
> > B.    Definition of Disability
> >
> > > 2.    The 80/80 Definition
> > >
> > > Until LTD Benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily Injury, or Pregnancy, you are either:
> > >
> > > > a.    Unable to perform with reasonably continuity the material duties of your own occupation; or
> > > > b.    Unable to earn more than 80% of your In-dexed Predisability Earnings while working in your own occupation.[207]

As the above indicates, the LTD Plan and Defendant's correspondence should have made

it abundantly clear to Plaintiff and her counsel that "The 80/80 Definition" of disability was the

applicable definition of disability.

In addition, the Court notes that in the appeal materials submitted to Defendant on July 3,

2007, Plaintiff's counsel included a document entitled "Facts Supporting Claimant's Meeting the

Definition of Disability and Rebutting Denial Rational Definition of Disability."[208]  In the first page

of that document, Plaintiff's counsel sets forth the text of the "The 80/80 Definition of Disability."[209]

Thus, it would appear that Plaintiff knew Defendant was operating under that definition..

---

[206]*Id*. at 63-82.

[207]*Id*. at 65.

[208]*Id.* at 1207.

[209]*Id.*

Finally, the Court notes that Plaintiff, in her very own statement of uncontroverted facts in support of her Motion for Summary Judgment, quotes verbatim the provisions of "The 80/80 Definition".[210] It thus defies logic that Plaintiff would attempt to argue that this definition is not in the record or that Defendant never defined the term "disability." The Court therefore rejects this as grounds for finding that Defendant's decision to deny Plaintiff benefits was arbitrary and capricious.

## B.    Plaintiff's Travel

Next, Plaintiff argues that Defendant's decision to deny benefits was arbitrary and capricious because Defendant failed to consider that Plaintiff traveled extensively as part of her job with KCM. As noted above, both Plaintiff's August 28, 2006 memo to Defendant and the job description Plaintiff's employer provided to Defendant in August of 2006 stated that Plaintiff traveled to Hong Kong and Shanghai to oversee the activities of co-fund managers.[211] Plaintiff's memo also indicated that she "traveled all over the US, Hong Kong, China and Europe."[212] In addition, a September 7, 2007 letter from her attorney to Defendant indicated that Plaintiff was required to travel internationally.[213]

Plaintiff argues that it was arbitrary and capricious for Defendant not to take this international travel into account. Had Defendant done so, it would have concluded that Plaintiff's medical condition precluded her from engaging in such travel and therefore it would have found that Plaintiff could not perform sedentary work or her job at KCM.

---

[210]*See* Statement of Fact 25, Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 5-6.

[211]*Id.* at 1711, 1712.

[212]*Id.* at 1711.

[213]*Id.* at 110.

Plaintiff cites two cases which she claims suggest that jobs requiring significant travel should not be considered sedentary.[214] Plaintiff also cites *Ratkovic v. Northrop Grumman Corp. Employee Welfare Benefit Plan* for the proposition that Defendant should have taken into account the travel requirements of her job.[215] She explains the significance of *Ratkovic* as follows:

> In a case similar to Berges, Ratkovic had a job requiring a lot of travel. Unum ignored the travel and tried to characterize the job of Ratkovic as sedentary. The court concluded that UNUM abused its discretion when it failed to consider undisputed evidence in the record that travel was an integral component of Ratkovic's occupation. The court thus overturned UNUM's denial of benefits. It is not clear whether the travel required by Ratkovic's position as it was performed at his employer took his work out of the "sedentary" category and placed him in the "light work" category. Stated differently, it is not clear whether the travel required by Ratkovic's position required "walking or standing to a significant degree" or "walking and standing for a brief time." While the court declines to rule on this issue, other courts addressing the question squarely have suggested that positions that require "significant travel" are not properly understood as "sedentary." Whether Ratkovic's position is properly understood as "sedentary" or as "light" work, the question is whether UNUM properly considered all of the duties of the position in deciding that Ratkovic was not disabled.[216]

Plaintiff does not explain how *Ratkovic* should be applied to this case. Presumably, Plaintiff contends that *Ratkovic* stands for the proposition that a plan administrator abuses its discretion if it fails to consider undisputed evidence that travel was an integral part of the plaintiff's job in determining whether the plaintiff was disabled. Applying *Ratkovic*, Plaintiff would have this Court rule that Defendant acted arbitrarily and capriciously by failing to consider the undisputed evidence in this case that Plaintiff traveled internationally as part of her job with KCM.

---

[214]*See Osborne v. Hartford Life and Acc. Ins. Co.*, 465 F.3d 296, 301-02 (6th Cir. 2006) ("there is a discrepancy between the significant travel required by Osborne's actual position and the Dictionary's classification of his occupation as sedentary"); *Wirries v. Reliance Standards Ins. Co.*, No. 01-565-E-MHW, 2005 WL 2138682, at *6 (D. Idaho Sept. 1, 2005) (referring to travel as a job duty that is "non-sedentary in nature.").

[215]No. CV 06-08255MMM(JWJ), 2009 WL 453056 (C.D. Cal. Feb. 20, 2009).

[216]Pl.'s Resp. to Def.'s Mot. for J. on the Admin. Rec. (doc. 23).

Defendant argues that *Ratkovic* is inapplicable to this case because Defendant distinguished between Plaintiff's ability to perform her particular job duties at KCM and her ability to perform her "occupation as it is performed in the national economy."[217] Defendant asserts that the LTD Plan in this case provides benefits only if a participant is unable to perform her occupation as that occupation is performed in the general economy. Thus, if traveling is not a typical duty of the occupation as it is generally performed in the national economy, Defendant had no obligation to consider it in determining whether Plaintiff was disabled. Defendant therefore argues it was not arbitrary and capricious for Defendant to disregard Plaintiff's claimed inability to travel.

As the Court has set out above, the LTD Plan in this case defines disability as the inability "to perform with reasonable continuity the material duties of your own occupation."[218] Defendant asserts that the LTD Plan defines "own occupation" as "any employment, business trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins."[219] Defendant also states that the LTD Plan provides that "[i]n determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy."[220] Defendant does not cite to the specific subsection of the LTD Plan where this language can be found, but does cite to page 840 of the Administrative Record.

---

[217] Def.'s Resp. to Pl.'s Mot. for Summ. J. (doc. 30) at 3.

[218] Admin. Rec. at 32.

[219] Def.'s Reply in Supp. of Mot. for J. on the Admin. Rec. (doc. 24) at 10.

[220] *Id.*

The Court has reviewed page 840 of the Administrative Record and finds that it contains the results of an EEG stress test and contains no such discussion of "own occupation." The Court has also scoured the entire record, including every page of the LTD Plan found at pages 23-58 of the Administrative Record, and finds no such discussion. Also, the LTD Plan contains a definition section which defines various terms used in the LTD Plan, but it contains no definition of "own occupation" or, for that matter, "occupation."[221] In addition, the "Index of Defined Terms," contains no definition of "own occupation."[222] Thus, the Court can only conclude that the LTD Plan does not define the term "own occupation" or explain how it is to be determined.

Although the term "own occupation" is not defined or explained in the LTD Plan, the Court notes that Defendant, in determining whether Plaintiff was disabled, consistently interpreted the term to mean Plaintiff's occupation "as it is performed in the general economy." This was communicated to Plaintiff on at least two occasions. First, the November 30, 2006 Denial Letter informed Plaintiff that given the physician consultant's opinion that Plaintiff could perform sedentary work, Plaintiff's file was reviewed by a vocational consultant "who determined that your Own Occupation is Chief Financial Officer (CFO), which qualifies as sedentary level work *as it is performed in the general economy*."[223] The Denial Letter further explained: "Please note that while the requirement of your job may be to travel overseas regularly, this is not a Material Duty of your Own Occupation;

---

[221]*See id.* at 29-31.

[222]*See id.* at 26.

[223]*Id.* at 218 (emphasis added).

therefore, the inability to travel extensively does not provide a basis for Disability under the Group Plan. As such, we did not evaluate whether you have the capacity to perform such activity."[224]

In addition, the March 11, 2008 letter from Defendant to Plaintiff's counsel regarding the Benefits Review Unit's review of Plaintiff's claim expressly stated that "[a] Vocational Consultant has reviewed Ms. Berges's claim file and has found that the performance of the material duties of the occupation of CFO, *as it is performed in the general economy,* would require the ability to perform sedentary work activity."[225] The letter further stated: "Although Ms. Berges may have been required to travel internationally while employed at KCM Capital, Inc., the occupation of Chief Financial Officer, *as it is performed [in] that general economy*, would not require international travel."[226]

In addition, these letters are consistent with the November 29, 2006 report of the Vocational Case Manager, Jeffery Smith, in which he states:

> The above [job title and description of Chief Financial Officer ] best identifies the claimant's Own Occupation . . . . This occupation is considered Sedentary *as it is performed in the general economy* and although the claimant's own job does appear to require overseas travel, jobs within her Own Occupation does exist where this type of extensive travel would not be required."[227]

Thus, the Court finds that although the LTD Plan does not define the term "own occupation," Defendant, as the administrator of the LTD Plan, has interpreted the term to mean occupation as performed in the general economy as opposed to the job duties the employer requires of the plan participant.

---

[224]*Id.* at 219.

[225]*Id*. at 66 (emphasis added).

[226]*Id*. at 81 (emphasis added).

[227]*Id*. at 1705 (emphasis added).

This does not end the Court's inquiry. The Court must still decide whether this is a reasonable interpretation of the LTD Plan. The Court finds Judge Van Bebber's opinion in *Panther v. Synthes (U.S.A.)*[228] to be instructive on this issue. In that case, the plaintiff, Valerie Panther ("Panther"), filed an ERISA action against Sun Life Assurance Company ("Sun Life"), who had underwritten and made the disability determination under a long-term disability plan sponsored by Panther's employer. Sun Life denied Panther benefits on the basis that Panther had failed to present satisfactory proof that she was unable to perform the material and substantial duties of her "own occupation."[229] More specifically, Sun Life found that the medical documentation did not support her inability "to perform the light duty occupation of Sales Consultant as it is routinely done in the labor market."[230] Panther asked the court to rule, as a matter of law, that the plan's language "all of the material and substantial duties of his own occupation" meant Panther's actual job with her employer, as opposed to her job as it was routinely performed in the market.[231]

Sun Life argued that its interpretation of "own occupation" was proper and that Panther's position was contrary to the language of the plan and substantial case law.[232] Judge Van Bebber agreed, and ruled that "'own occupation' means one's general profession, rather than one's specific duties for a particular employer."[233] Judge Van Bebber held:

> The court concludes that Sun Life properly defined "own occupation" to mean one's occupation as it is performed routinely in the labor market, rather than how a

---

[228]371 F. Supp. 2d 1267 (D. Kan. 2005).

[229]*Id*. at 1270.

[230]*Id*. at 1272.

[231]*Id.* at 1276.

[232]*Id.*

[233]*Id*.

particular employee performed his or her job for a particular employer . . . .  The term "occupation" as used in the LTD plan is not ambiguous.  Webster's Third New International Dictionary defines "occupation" as "[t]he principal business of one's life: a craft, trade, profession or other means of earning a living."  Webster's Third New  International Dictionary 1560 (1986).  The plain meaning of "occupation" connotes a general characterization of a person's type of work, not the specific duties an individual performs for his or her employer.[234]

In so ruling, Judge Van Bebber recognized a significant number of other courts that have reached similar conclusions in construing the term "own occupation" or "regular occupation."[235] For example, in *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*,[236] the court held that the plan administrator did not abuse its discretion in construing the term "own occupation" to mean the way in which the occupation is defined generally, rather than construing it to mean the specific duties of the job held by the plan participant.[237]  The plan at issue in *Ehrensaft* contained language virtually identical to the language of the LTD Plan in this case; a participant was disabled if he was "unable to perform with reasonable continuity the material duties of his own occupation."[238]  The plaintiff argued that the plan administrator was required to use the specific requirements of his "job" rather than his "occupation" as defined generally.[239]  The plaintiff was a CPA who worked as controller for his employer, and he asserted that his employer required him to perform not only the duties usually associated with being a controller but also such tasks as lifting computer equipment

---

[234]*Id*. at 1278-79.

[235]*Id*. at 1278 (citations omitted).

[236]120 F. Supp. 2d 1253 (D. Nev. 2000), *aff'd,* 33 Fed. Appx. 908 (2002).

[237]*Id*. at 1259.

[238]*Id.* at 1258.  The definition in this case is identical except that it states "your own occupation" instead of "his own occupation."  *See* Admin. Rec. at 32.

[239]*Ehrensaft*, 120 F. Supp. 2d at 1259.

and reams of paper.[240]  His back condition precluded him from doing those particular tasks.  He argued that because he could not perform his specific job, he was disabled.[241]  The court disagreed, holding:

> The policy language clearly uses the word, "occupation."  Occupation is a general term.  The policy does not require disability from a particular job's or employer's requirements . . . .
>
> To accept Plaintiff's argument that total disability means that a person cannot physically do some specifically assigned task, would permit employers and employees to arrange for some physically impossible task which the employee is unable to perform and then, based upon that inability, declare the employee totally disabled.  Such an interpretation would be entirely unreasonable.  The Court finds that the application of the term, "own occupation," should be done generally, i.e., that the evaluation of disability should be made in light of the usual duties of that occupation and not depend on ad hoc peculiarities of a specific job or the require- ments of a particular employer who may require activities beyond that generally contemplated by the "occupation." Accordingly, [Defendant], in its administration of this Plan did not abuse its discretion in applying that definition of "own occupation.[242]

The Court finds that *Ehrensaft* and *Panther* are well reasoned and applicable to this case. Under the rules enunciated therein, the Court concludes that Defendant properly defined "own occupation" to mean a participant's occupation as it is generally performed in the national economy. Defendant was not limited to looking at the way Plaintiff performed her job for KCM or the particular job duties that Plaintiff performed for KCM that went beyond the typical manner in which the occupation is performed.[243]  Accordingly, Defendant was not required to take into consideration

---

[240]*Id*. at 1258-59.

[241]*Id*.

[242]*Id*. at 1259.

[243]Defendant in this case is granted the authority to interpret the LTD Plan to "resolve all questions arising in the administration, interpretation, and application" of the LTD Plan. Admin. Rec. at 56.  Defendant therefore had the authority and discretion to interpret the phrase "own
(continued...)

the international travel that Plaintiff performed for KCM in determining whether Plaintiff was disabled. The Court therefore rejects Plaintiff's argument that Defendant acted arbitrarily and capriciously in failing to consider her travel for KCM.

### C. Defendant's Reliance on the Dictionary of Occupational Title Classification 186.117-054 and Failure to Consider Chief Compliance Officer Title

Plaintiff contends that Defendant's decision to deny benefits was arbitrary and capricious because Defendant failed to consider that she was employed by KCM as Chief Compliance Officer (in addition to Chief Financial Officer) and because Defendant relied on the wrong DOT classification. Plaintiff states:

> [Defendant] had its vocational person use a Dictionary of Occupational Titles (DOT) job name/number for "President, Financial Institution" and switch it claiming the job title, description, and job number was for "chief financial officer[.]" It was not. Then some [Defendant] person apparently placed a document in the Administrative Record to make the switched job title/job description appear as authoritative.[244]

Plaintiff implies that Defendant or its vocational consultant was involved in some type of scheme to make it appear that it was relying on the correct job title when in fact Defendant or the vocational consultant knew that it was not the proper job title. Plaintiff explains that DOT 186.117-054 actually applies to the occupation of "President, Financial Institution." She also states that neither the Chief Compliance Officer nor Chief Financial Officer position is found in the DOT.

The record in this case, however, reveals that Defendant's Vocational Case Manager, Jeffery Smith, submitted a report indicating that DOT Title 186.117-054 existed for the position of Chief

---

[243](...continued)
occupation." Because it had such discretion, the Court must review its interpretation of any plan term under an arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (where plan gives administrator discretion to construe the plan's terms, the administrator's interpretation of plan terms will be reviewed under an arbitrary and capricious standard).

[244]Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 1.

Financial Officer.[245]  It was this DOT Title and its accompanying description of job duties and sedentary classification that Mr. Smith relied upon in drawing his conclusion that Plaintiff could perform the  occupation of chief financial officer.[246]  Furthermore, Sandy Johnson, the Vocational Case Manager involved in the Benefits Department Review of Plaintiff's claim, relied upon Mr. Smith's assignment of this DOT Title and its corresponding job duties in making her report of August 22, 2007.[247]

In the briefing, Defendant does not dispute that DOT Title 186.117-054 is the number assigned to the occupation of "President, Financial Institution."  Nor does Defendant dispute that there is no specific DOT Title assigned to the occupations of Chief Financial Officer or Chief Compliance Officer.  Defendant does, however, explain that Defendant "pays for and uses a job browser that searches the Dictionary of Occupational Titles for the occupation that has job duties most similar to those of the person submitting the claim."[248]  Defendant further states that "[o]n this occasion, the job browser selected DOT 186.117-054 and the rehabilitation counsel concurred. Because the job browser was searching for duties of a 'Chief Financial Officer,' it included that title on its printout."[249]

In light of the above, the Court does not find that there is any reasons to believe that the DOT Title was fraudulently used or placed in the record.  The Court, however, must still determine whether the Vocational Case Manager relied upon DOT Title 186.117-054 in making his vocational

---

[245]Admin. Rec. at 1704-05.

[246]*Id.*

[247]*See id.* at 1700-01.

[248]Def.'s Reply in Supp. of Mot. for J. on the Admin. Rec. (doc.24) at 24 n.7.

[249]*Id.*

determination. In relying on this specific DOT Title, Mr. Smith concluded that the job duties described for that DOT Title corresponded to Plaintiff's job duties based on his consideration of "the job description, the Employer's Statement, the Employee's Statement and correspondence from the claimant to the Disability Benefits Analyst dated August 28, 2006."[250]

As noted in the recitation of facts, the Employee's Statement Plaintiff completed listed her job title as "CF-Admin-CCO."[251] The Employer's Statement, in contrast, listed her job title only as "CFO."[252] The Personnel Directory also listed Plaintiff's job only as "CFO."[253] The exact job title, however, is not as important as the job duties. In Plaintiff's August 28, 2006 correspondence to Defendant,[254] she listed fifteen job duties, all but one of which were also listed in the job description that her employer provided to Defendant.[255] Thus, while there was some disagreement as to what Plaintiff's exact job *title* was, there was agreement as to what Plaintiff's job *duties* were. The Vocational Case Manager found that those job duties best aligned with the job duties described in DOT Title 186.117-054.

Significantly, Plaintiff never argues that DOT Title 186.117-054 is an inaccurate description of Plaintiff's material duties. While the Court does not find it to be a perfect fit, it cannot say it was unreasonable for Defendant to find that the description matched those duties listed in both Plaintiff's August 28, 2006 correspondence and her employer's job description.

---

[250]*Id.* at 1705.

[251]*Id*. at 300.

[252]*Id.* at 289.

[253]*Id*. at 1706.

[254]*See id.* at 1710-11.

[255]*See id.* at 1712.

Plaintiff also complains that Defendant failed to consider her Chief Compliance Officer job title. The Court notes, however, that there is some evidence in the record (the Employer's Statement, Personnel Directory, and Attending Physician's Statement completed by Plaintiff), which shows that Chief Compliance Officer was never part of Plaintiff's job title. In any event, even if it were part of Plaintiff's title, Plaintiff does not show that Chief Compliance Officer job duties would require more than sedentary work or how consideration of that title would have affected the Vocational Case Manager's findings.

In sum, the Court cannot find that Mr. Smith's vocational analysis was so flawed that it did not provide Defendant with a reasonable basis to find that Plaintiff's occupation was Chief Financial Officer and that it was a sedentary position as performed in the general economy. Thus, the Court concludes that Plaintiff has not shown that the Vocational Case manager's reliance on DOT Title 186.117-054 or his failure to expressly consider a Chief Compliance Officer job title rendered Defendant's decision arbitrary and capricious.

### D. Defendant's Failure to Provide Drs. Haselwood and Ingram with Information About Plaintiff's Job Title, Job Descriptions, and Job Requirements

Plaintiff contends Defendant's decision to deny benefits was arbitrary and capricious because "[Drs.] Haselwood and Ingram were never provided the job titles, job descriptions, and statements by Berges regarding her job requirements."[256] Plaintiff provides absolutely no argument or explanation of how this alleged error resulted in an arbitrary or capricious denial of Plaintiff's claim. The failure to provide the consulting physicians with Plaintiff's job titles, job descriptions, and statements about her job requirements would be material only if Plaintiff's "job" and her ability to perform that "job" were material to a finding of disability. As discussed above in Part VI. B,

---

[256]Pl's Resp. to Mot. for J. on the Admin. Rec. (doc. 23) at 18.

however, Plaintiff's ability to perform her "job" was not at issue. Rather, it was Plaintiff's ability to perform her "own occupation," which Defendant has properly construed to mean the ability to generally perform the occupation in the national economy and not the ability to perform the particular tasks and duties of the employee's particular job with a particular employer. Thus, Plaintiff's job title, job descriptions, and particular job requirements were not material and were not required to be provided to Drs. Haselwood and Ingram.[257] Consequently, the Court rejects Plaintiff's argument that any failure of Defendant to provide this job-related information resulted in an arbitrary or capricious decision.

### E. Drs. Haselwood and Ingram Are Not Vocational Authorities

Plaintiff next contends that Defendant's decision was arbitrary and capricious because "[Drs.] Haselwood and Ingram are not vocational authorities."[258] Plaintiff, however, provides no argument in support of this contention, and, in fact, fails to discuss it at all other than to state in her Statement of Facts that: (1) "There is nothing in the record [sic] Haselwood has any vocational experience of

---

[257]The Court notes that Defendant did inform both doctors that Plaintiff's job title was Chief Financial Officer. Defendant provided Dr. Ingram with Plaintiff's job title of "CFO" in its September 7, 2006 memo to Dr. Ingram. *See* Admin. Rec. at 454 ("The claimant is a 38 y/o female CFO, who ceased work on 1/30/06 . . . ."). In addition, Dr. Ingram notes in her September 15, 2006 Physician Consultant Memo that Plaintiff "is a 38-year-old chief financial officer." *Id.* at 441. Defendant also provided Dr. Haselwood with Plaintiff's job title of "CFO" in its October 18, 2007 letter to Dr. Haselwood. *See id.* at 339 ("From November 24, 2997 to January 3, 2006, [Plaintiff] was employed by KCM, Inc. as CFO.").

[258]Pl.'s Resp. to Def.'s Mot. for J (doc. 22) at 18; Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 12.

authority";[259] and (2) "Nothing is found that Ingram has any idea what is required for a sedentary or light occupation."[260]

Defendant agrees that neither doctor specializes in vocational rehabilitation. Defendant points out, however, that neither doctor was retained to provide any vocational opinions. Those opinions were provided by Sandy Johnson and Jeffrey Smith, who are experienced Certified Rehabilitation Counselors.[261] Drs. Haselwood and Ingram were asked to review Plaintiff's medical records and to provide their professional opinions regarding Plaintiff's SLE, arthritis, and other medical conditions, and to provide opinions regarding how those medical conditions might result in functional impairments.[262] While they both provided opinions regarding Plaintiff's ability to perform sedentary and light work, Plaintiff provides no basis for the Court to conclude those opinions were improper.

In light of the above, the Court rejects Plaintiff's assertion that Defendant's decision was arbitrary and capricious because neither Dr. Haselwood nor Dr. Ingram was a "vocational authority."

### F. Medical Records Provided to Drs. Haselwood and Ingram

Plaintiff next contends that the decision to deny Plaintiff benefits was arbitrary and capricious because "[t]here is nothing in the record to reach the conclusion [Defendant] provided all medical records to Haselwood or Ingram."[263] Plaintiff argues: "In the Haselwood Letter (A.R. 314-339), he never identifies what records he was provided. He refers to 'medical records.' There is nothing in

---

[259]Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 8, Statement of Fact, ¶¶ 36.

[260]*Id*., Statements of Fact, ¶¶ 41 & 43.

[261]*See* Report of Jeffery Smith, Admin. Rec. at 1704-05, 1708-09; Report of Sandy Johnson, *id*. at 1700-02.

[262]*See* Admin. Rec. at 339-42, 454.

[263]P.'s Resp. to Def.'s Mot. for J. on the Admin. Rec. (doc. 23) at 18; Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 11-12.

the A.R. that Haselwood received or reviewed 'all the medical records.'"[264]  Plaintiff also argues with respect to Dr. Ingram:  "Shirley Ingram, MD does not provide a complete list of medical records she was provided.  She identifies records she reviewed, but does not identify other records she may have been provided and ignored."[265]

The Court finds Plaintiff's position to be without merit.  First, Dr. Haselwood's November 8, 2007 report notes each record that he reviewed and each record's date.  As is set out in great detail above in the recitation of facts, Dr. Haselwood indicated in his report that he reviewed fourteen reports, three letters, and two notes of Dr. Welch; three memos and one letter of Dr. Ingram; one memo from Dr. Toenniessen; two reports of Dr. Amundson; three reports of Dr. Eubanks; three reports of Dr. Bryniarski; one report of Dr. Allen; one report of Dr. Bodensteiner; one report from Dr. Lynch; one report from Lisa Keen (Rehabilitative Consultant); five diagnostic imaging studies (three MRI scans and one X-ray); and nineteen diagnostic laboratory studies.[266]  The date of each report, memo, etc. was also identified.  In addition, Dr. Haselwood's report indicated that he reviewed serial cardiology consultation and treatment reports from Mid-America Cardiology for the period June 21, 2001 through November 30, 2005 and a final cardiology note dated November 20, 2005, in addition to an 86-page "legal submission."[267]

Furthermore, Dr. Haselwood's report indicated:

---

[264]P.'s Resp. to Def.'s Mot. for J. on the Admin. Rec. (doc. 23) at 9; Pl.'s Resp. to Def.'s M. for J (doc. 29) at 7; see also Pl.'s Resp. to Def.'s Mot. for J. on the Admin. Rec. (doc. 29) at 4 ("There is no written communication from Standard to Douglas Haselwood, MD as to what medical records were submitted to him.  He does not identify the records he was provided.").

[265]Pl.'s Mem. in Supp. of Mot. for Summ. J. (doc. 29) at 5.

[266]Admin. Rec. at 315-25.

[267]*Id.*

A little over six inches of records pertaining to Ms. Berges were submitted for reviewed and they were collated by date and source by technical staff. All record entries were personally reviewed, but non-relevant, duplicative, illegible or undated material may not have received citation [in this report].[268]

As Defendant notes in its briefs, the entire record in this case—which was submitted to the Court—consists of approximately seven inches of documents, approximately one inch of which consists of plan documents and correspondence between Defendant and Plaintiff or Plaintiff's counsel. The Court finds that the records provided to and reviewed by Dr. Haselwood were more than adequately identified in the record.

The same is true with respect to the records provided to and reviewed by Dr. Ingram. Dr. Ingram's Physician Consultant Memo dated September 15, 2006 states: "I am asked to review [Plaintiff's] file . . . . The entire file is reviewed."[269] She then states: "Medical records are available from rheumatologist Dr. Welch from November 2, 2004 through July 2006, as well as neurology records from Dr. Bryniarski from October 29, 2004, through September 30, 2005, cardiology records from Dr. Emert in fall 2005, and cardiology records from Dr. Kramer in February 2006, as well as gynecology records from Dr. Batty from 2003 through June 21, 2006."[270] In addition, she states: "There are also primary care records from Dr. Moriarty."[271] Dr. Ingram analyzed those various records, identifying the specific record by doctor and date.[272]

---

[268]*Id.* at 315.

[269]*Id.* at 441.

[270]*Id.*

[271]*Id.* at 444.

[272]*Id.* at 441-445.

In a separate Physician Consultant Memo dated November 28, 2006, Dr. Ingram states that she reviewed a November 16, 2006 letter from Dr. Welch responding to Dr. Ingram's September 15, 2006 letter requesting additional information regarding Plaintiff's impairments.[273]

With respect to Dr. Ingram's second review of medical records, the record is equally clear as to what she reviewed. Dr. Ingram specifically identified in her July 21, 2007 Physician Consultant Memo the medical records she reviewed: 1) medical records of office visits to Dr. Welch on August 3, October 5 and December 19, 2006, and February 21, 2007, along with a May 18, 2007 letter from Dr. Welch addressed "To Whom It May Concern"; (2) record of Dr. Higgins from June 2, 2006; (3) laboratory tests from June, November 2 and December 19, 2006, and January 10, 2007, and laboratory flow sheets from 2006, including a December 19, 2006 flow sheet; (4) records of Dr. Amundson from October 4, November 4, and December 20, 2006, and February 20, 2007; (5) MRI on October 9, 2006; (6) gynecology records of Dr. Batty from October 11, 2006 through February 20, 2007; (7) physical therapy notes from January 4, 2007 to February 8, 2005; (8) neurology records of Dr. Arthur Allen, II on August 8, 2001 and January 8, 2007; (9) cardiology records of Dr. Kramern Crouse on July 19 and November, 2005 and February 24, 2006; and (10) phone call records of Dr. Emert for March 2006.[274] She also indicated she had reviewed the vocational report of Lesa Keen dated June 7, 2007.[275]

Given the detail with which both Dr. Haselwood and Dr. Ingram describe the records they reviewed, the Court finds no reason to suspect that any documents were withheld from these physicians or that they failed to review any pertinent records. If Plaintiff sincerely believes that

---

[273]*Id.* at 426.

[274]*Id*. at 405-08.

[275]*Id.* at 409.

records were withheld or not reviewed so as to make Defendant's decision arbitrary and capricious, then Plaintiff has the burden to identify those documents or, at a minimum, provide the Court with some reasonable basis to believe that certain document or categories of documents were not provided or not reviewed. In the absence of such information, the Court finds no basis to conclude that Defendant's decision to deny benefits was arbitrary and capricious.

### G. Did Substantial Evidence Support Defendant's Decision to Deny Plaintiff Benefits?

The Court will next consider whether substantial evidence supported Defendant's decision to deny Plaintiff benefits. As discussed above, "substantial evidence" is such evidence that a reasonable mind might accept as adequate or sufficient to support an administrator's decision.[276] In other words, it is more than a scintilla, but less than a preponderance.[277] In determining the substantiality of the evidence, the court must evaluate the administrative record as a whole.[278]

Other than pointing to the issues already discussed above, Plaintiff makes no attempt to show that the decision to deny Plaintiff benefits was not supported by substantial evidence. Defendant, on the other hand argues that the evidence exceeds the "substantial evidence" standard.

The Court has thoroughly reviewed the record and concludes that substantial evidence did in fact support Defendant's decision to deny Plaintiff disability benefits. Because Plaintiff does not even attempt to show what evidence was lacking or how Defendant's decision was not reasoned, the Court will not go into great detail. Suffice it to say, the Court finds that substantial evidence supported Defendants decision in the following ways. Defendant retained two board certified

---

[276]*Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

[277]*Id.*

[278]*Id.*

rheumatologists, Dr. Ingram and Dr. Haselwood, to review Plaintiff's medical records. As part of Defendant's initial review of Plaintiff's claim, Dr. Ingram reviewed the medical records available and issued a thorough report on September 20, 2006, in which she noted that Plaintiff been diagnosed with SLE and that Plaintiff had a history of Raynaud's phenomenon, arthralgias, possible seizure disorder, mild episodic lymphoenia, and a history of photosensitive rash.[279] In her report, Dr. Ingram observed that at the time Plaintiff stopped working on January 30, 2006, her serologies were negative, her joint exam was normal, her SLE and arthritis conditions were stable with medication, and her prednisone dosage was being tapered.[280] Dr. Ingram also noted that Plaintiff remained physically active after stopping work and that Plaintiff had planned two months in advance to stop working in January 2006. Dr. Ingram further observed that Plaintiff's treating physician had made no recommendations that Plaintiff stop working.[281]

Dr. Ingram opined that the medical records supported a possible/probable minor seizure disorder but that it was unlikely it would limit Plaintiff from working in her own occupation.[282] She also opined that no laboratory report or physical exam supported "an active autoimmune disease" by at the time Plaintiff stopped working. She also found no support in the medical records that would limit Plaintiff from working in a full-time sedentary or light occupation.[283] She observed that Plaintiff's medications "would not be expected to be limiting."[284] She also stated that although

---

[279]*Id.* at 444.

[280]*Id.*

[281]*Id.* at 444-45.

[282]*Id.* at 444-45.

[283]*Id.* at 445.

[284]*Id.*

chronic autoimmune disease can cause fatigue, she would expect Plaintiff's reported fatigue to be improved with the significant medication she was taking and that there was a high likelihood that

Plaintiff's fatigue complaints were not related to active autoimmune disease.[285] After requesting and obtaining additional information from Dr. Welch, Dr. Ingram concluded that no additional information had been provided that would change her opinion that Plaintiff did not have a physical condition that restricted her from performing her own full-time light occupation.[286]

Dr. Haselwood reviewed Plaintiff's records as part of the second level of review Plaintiff received. He opined in his November 8, 2007 written report that, based on the rheumatologic evidence, Plaintiff had the physical capacity to perform full-time employment involving a full range of sedentary to light physical activities.[287] He further opined that her medical records did not support a diagnosis of SLE because they substantiated only two out of the eleven diagnostic criteria set by the American College of Rheumatology for a diagnosis of SLE.[288] He also found that the medical records did not support her reported symptoms of Raynaud's syndrome.[289] Furthermore, Dr. Haselwood opined that it was not reasonable to conclude that Plaintiff's chronic undifferentiated rheumatic disease "would cause sustained or vocationally debilitating fatigue.".[290] With respect to Plaintiff's seizure disorder, he found that the records did not document any seizure activity during the time period January 30, 2006 through November 8, 2007 and thus concluded there was no

---

[285]*Id.*

[286]*Id.* at 426.

[287]*Id.* at 323, 324.

[288]*Id.* at 321-22.

[289]*Id.* at 324.

[290]*Id.* at 323.

evidence that a seizure disorder impaired Plaintiff's vocational functionality during that same period.[291] Finally, he opined that the medical records did not support the conclusion that "objectively substantiated medical/rheumatologic pathophysiology" was of such severity to prevent Plaintiff from engaging in sedentary work.[292]

The Court finds that it was reasonable for Defendant to rely on these consulting physicians in determining that Plaintiff's purported disabling conditions were not as limiting as claimed and that she could perform sedentary work. Defendant was under no obligation to defer to Dr. Welch's diagnosis of SLE or Raynaud's syndrome. It is well settled that ERISA does not require plan administrators to "accord special deference to the opinions of treating physicians," nor does it place "a heightened burden of explanation on administrators when they reject a treating physician's opinion."[293] Furthermore, the Court notes that Dr. Welch's own medical records do not indicate that she ever recommended Plaintiff stop working. Dr. Welch's November 29, 2005 record merely indicates that Plaintiff informed Dr. Welch that she was planning to take a three month leave of absence from work.[294] The record does not show that Dr. Welch recommended or directed Plaintiff to take such a leave. Moreover, when Dr. Ingram asked Dr. Welch to provide "a brief narrative detailing any specific findings that would support" Plaintiff's limitations from work,[295] Dr. Welch merely responded that Plaintiff had *told her* she was unable to work. She also responded that Plaintiff

---

[291]*Id*. at 325.

[292]*Id*.

[293]*Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325 (10th Cir. 2009) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003)).

[294]Admin. Rec. at 503.

[295]*Id*. at 431.

currently had no active synovitis although she did complain of fatigue joint pain and Raynaud's.[296]

Dr. Welch did not provide any medical assessment or opinion that Plaintiff was unable to work.

Notably, only one document reveals that Dr. Welch ever recommended that Plaintiff stop working. That recommendation was noted in the Attending Physician's Statement that Dr. Welch completed on April 6, 2006. In that statement, Dr. Welch indicated that she had recommended to Plaintiff on January 30, 2006 that she stop working due to fatigue and active SLE.[297] Defendant was not required to give this Attending Physician Statement determinative weight, however, because it was not supported by, and in fact was contrary to, Dr. Welch's own records.[298]

Defendant also accepted and examined evidence that Plaintiff presented to show that she had developed depression and dementia *after* she stopped working in January 2006. Plaintiff submitted Dr. Mouille's psychological evaluation which was conducted on May 14, 2007,[299] more than one year after Plaintiff stopped working and claimed disability. In that evaluation, Dr. Mouille never asserted that Plaintiff was mentally impaired on the relevant date of January 30, 2006, when Plaintiff stopped working. Thus, even assuming arguendo that Plaintiff was impaired as of the date of Dr. Mouille's psychological evaluation, it would not establish that she was impaired on January 30, 2006. Nevertheless, Defendant retained two independent doctors, one a psychiatrist, Dr. Toenniessen, and

---

[296]*Id.* at 429.

[297]*Id.* at 463.

[298]*See Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 333-34 (5th Cir. 2001) (finding no abuse of discretion where administrator failed to give treating physician's post-termination changed opinion determinative weight because it was not supported by his previous findings nor the medical evidence); *Cook v. Standard Ins. Co.*, No. 608-CV-759-ORL-35DAB, 2010 WL 807443, at *12 (M.D. Fla. Mar. 4, 2010) (administrator not required to give treating physician's post-termination Attending Physician Statement determinative weight or overriding significance, particularly since it was unaccompanied by medical evidence).

[299]Admin. Rec. at 388-399.

another psychologist, Dr. Binder, to review the evaluation. Dr. Toenniessen found that the evaluation documented "normal performance" and did not support a finding that Plaintiff had a mental impairment which would prevent her from working in her own occupation of Chief Financial Officer.[300] Dr. Toenniessen also found that the evaluation did not support a diagnosis of major depression or dementia.[301] Dr. Binder reviewed Dr. Mouille's evaluation and expressed concerns about the accuracy of the scores Dr. Mouille provided in his report. Dr. Binder found there was no support for any finding that Plaintiff had a deficit in executive functioning or that Plaintiff suffered from dementia because "there is no area of cognitive impairment."[302] Moreover, he noted that Dr. Mouille provided no documentation of "any actual cognitive difficulty performing the job of chief financial officer."[303] Upon receiving the raw data upon which Dr. Mouille based his findings, Dr. Binder found further errors that caused him to go so far as to question Dr. Mouille's competence.[304]

Finally, the Court also notes that there is no pre-termination document (i.e., document prepared before January 30, 2006) in the record which shows that any treating physician ever opined that Plaintiff was unable to work or perform her job or ever recommended that Plaintiff stop working.

In sum, given the extensive and thorough independent reviews of the medical and psychological records, and the lack of supporting evidence from Plaintiff's own treating physicians, the Court concludes that Defendant had a reasoned basis to believe that Plaintiff was not so impaired as to be unable to perform sedentary work.

---

[300]*Id.* at 418.

[301]*Id.*

[302]*Id.* at 356.

[303]*Id.* at 356-57.

[304]*Id.*

Given the medical records' support for a finding that Plaintiff could perform sedentary work, Defendant had two different Vocational Case Managers render vocational opinions, and they both concluded that Plaintiff could perform the occupation of Chief Financial Officer as it is performed in the national economy. As noted above in Part VI. B., the vocational experts were not required to consider the special travel requirements of Plaintiff's job with KCM. Moreover, the Court finds that it was reasonable for Defendant to discount the findings of Plaintiff's vocational expert, Lesa Keen. As already noted, Ms. Keen's finding that Plaintiff was unable to work was based merely on Ms. Keen's acceptance of Dr. Mouille's questionable psychological findings and on her observations of that Plaintiff's fatigue during the interview, her inability to remember employment dates, and Plaintiff's self-reported problems with employment. The Court finds that Defendant acted reasonably in discounting Ms. Keen's findings.

Based on the foregoing, the Court concludes that substantial evidence supported Defendant's decision to deny Plaintiff benefits.

## H. Consideration of the Conflict of Interest

Finally, in considering Defendant's decision in this case, the Court must account for Defendant's conflict of interest. As noted above, it is one factor that the Court may consider in determining whether Defendant acted arbitrarily and capriciously. Although Plaintiff cites case law regarding the conflict of interest analysis, she does not suggest how the conflict may have tainted the decision in this case.

Given the strength of evidence in the record that Plaintiff was not disabled, the Court does not find that Defendant's conflict of interest draws Defendant's decision to deny Plaintiff benefits into question. Defendant took steps to reduce its inherent bias by retaining two board certified rheumatologists, one board certified psychiatrist, and one board certified psychologist to review

Plaintiff's medical and psychological records. As the Tenth Circuit has observed, where a conflict of interest exists, "the administrator best promotes the purposes of ERISA by obtaining an independent evaluation."[305]

The Court also notes that Defendant provided Plaintiff with two separate reviews after her claim was initially denied, one by the Benefits Review Department and another by the Administrative Review Unit. In addition, Defendant took steps to make sure the record was complete. One of the independent consulting rheumatologists wrote Dr. Welch to invite her to provide any additional information that would support Plaintiff's claimed limitations.[306] When Dr. Welch did not timely respond, Defendant wrote Plaintiff and asked that she follow up with Dr. Welch to obtain that information.[307] In addition, when the consulting psychologist had concerns about Dr. Mouille's psychological evaluation, he requested that Dr. Mouille provide him the raw data underlying the evaluation to ensure that his own concerns were correct. Finally, Defendant had more than one vocational consultant review the vocational information in the file.

Based on the above, the Court finds that any impact of Defendant's conflict of interest was minimal and did not improperly motivate Defendant's decision to deny Plaintiff benefits. Thus, even taking into account the conflict of interest, the Court still finds that Defendant's decision to deny Plaintiff benefits was supported by substantial evidence and not arbitrary or capricious.

**VII.    Conclusion**

Having carefully reviewed the administrative record, the Court finds that Defendant's decision to deny Plaintiff's claim for disability benefits was not arbitrary and capricious.

---

[305]*Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1015 (10th Cir. 2004).

[306]Admin. Rec. at 431-32.

[307]*Id.* at 156.

Furthermore, the Court finds that the administrative record contains sufficient facts to show that Defendant's decision was a reasonable one based on substantial evidence. Finally, the Court finds that the conflict of interest created by Defendant's dual insurer and administrator status had minimal impact so as to not draw Defendant's decision into question. For these reasons, the Court denies Plaintiff's Motion for Summary Judgment and grants Defendant's Motion for Judgment on the Administrative Record, which the Court construes as a Motion for Summary Judgment.

**IT IS THEREFORE ORDERED** that Plaintiff Marcey Berges' Motion for Summary Judgment (doc. 28) is denied.

**IT IS FURTHER ORDERED** that Defendant Standard Insurance Company's Motion for Judgment on the Administrative Record (doc. 15), which the Court construes as a motion for summary judgment, is granted.

**IT IS SO ORDERED**.

Dated in Kansas City, Kansas on this 31st day of March 2010.


s/ David J. Waxse
David J. Waxse
U. S. Magistrate Judge


cc:    All counsel and *pro se* parties